UNITED STATES of America, Appellee,

v.

**Billy Wayne REEDER, Appellant.**

No. 79–1236.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1980.

Decided Feb. 11, 1980.

Rehearing and Rehearing En Banc
Denied March 11, 1980.

James E. Shoffey, Fort Smith, Ark., filed brief, for appellant.

Larry R. McCord, U. S. Atty., and Steven N. Snyder and J. Michael Fitzhugh, Asst. U. S. Attys., Fort Smith, Ark., filed brief, for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and THOMAS,* Senior District Judge.

STEPHENSON, Circuit Judge.

Defendant was indicted on three counts of a forty-five count indictment charging eight individuals with various violations of federal gambling laws. His jury trial[1] resulted in convictions on all three counts. On appeal defendant challenges the sufficiency of the evidence on all three counts, and contends his trial was prejudiced by the failure to grant him a severance. We affirm his convictions.

## I. Count I

Count I alleged that from September 18, 1977 through January 15, 1978, defendant Reeder, with Jimmy Fiddler, Kathy Wise, Charles Reid, Clem Wald, James Stovall, C. B. Cox, and John Witt, was involved in an illegal gambling business, and said illegal gambling business involved five or more persons and others whose identity were unknown to the grand jury, all in violation of 18 U.S.C. § 1955. 18 U.S.C. § 1955(b)(1) defines an illegal gambling business as one which:

> (i) is a violation of the law of a State or political subdivision in which it is conducted;

> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

---

* The Honorable Daniel H. Thomas, Senior District Judge, United States District Court for the Southern District of Alabama, sitting by designation.

1. The Honorable Paul X Williams, Chief Judge, United States District Court for the Western District of Arkansas, presiding, imposed a suspended sentence, probation of three years, and a fine of $2,500.

On appeal defendant does not contend there was insufficient evidence for the jury to find a violation of state law, or that there was insufficient evidence of a substantially continuous operation for a period in excess of thirty days. The basis of defendant's argument is that there was insufficient evidence to show a single gambling business of five or more individuals.

■■■ This circuit has on several occasions examined the congressional intent in enacting 18 U.S.C. § 1955. *See United States v. Schaefer,* 510 F.2d 1307, 1311 (8th Cir.), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975); *United States v. Brick,* 502 F.2d 219, 224 (8th Cir. 1974). The scope of section 1955 is broad and excludes only customers of the business. The jurisdictional five persons may include unindicted and unnamed persons as well. *United States v. Bourg,* 598 F.2d 445, 448 n. 6 (5th Cir. 1979). The violator of the statute need not know that the activity engaged in was composed of five or more participants. *United States v. Schaefer, supra,* 510 F.2d at 1311. Section 1955 requires only that the involved person "conduct" the business, which allows a person to be counted who contributes to the gambling operation without having any control of it. *United States v. Bennett,* 563 F.2d 879, 882 (8th Cir. 1977).[2]

■■ Viewing the evidence in the light most favorable to the verdict, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and in more detail *infra* as required, it appears the convictions rest upon defendant's activity with a bookmaking operation centered around James Stovall and Clem Wald (Stovall-Wald), who pled guilty to violating 18 U.S.C. § 1955. The Stovall-Wald book operated its gambling business out of Paris, Arkansas, and was involved with various gamblers in other cities throughout Arkansas.

Defendant clearly was a bookmaker, who accepted and placed bets, published a line,[3] and charged bettors a ten percent juice[4] if they lost their bets. One bettor with defendant was Bob McCabe, who obtained line information and bet approximately once a week with defendant and had others place bets through him to defendant. One witness was told to pick up his money at McCabe's in the event he won, or to leave it with McCabe if he lost. This witness in fact paid his bet with defendant to McCabe personally.

Defendant's relationship with Stovall-Wald was extensive. During April 1977 through January 1978, in which telephone records were checked, defendant or defendant's wife called Stovall-Wald 728 times. Stovall stated that defendant's wife called nearly as often as defendant. He stated at trial he provided defendant or defendant's

---

**2.** The jury was properly instructed on the meaning of "conduct." The trial court followed the suggested instruction in E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 61.05 (1977):

The term, "conduct" as it is used in connection with the gambling business means to perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business. A person may be found to conduct a gambling business even though he is a mere servant or employee, having no part in the management or control of the business and no share in the profits.

A mere bettor or customer of a gambling business cannot properly be said to conduct the business.

**3.** We defined "line" in *United States v. Thomas,* 508 F.2d 1200, 1202 n. 2 (8th Cir.), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975) as follows:

The "line" constitutes the "odds" or "handicaps" or "point spreads" on the wagered contests. This is a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that team must win by a score exceeding the point spread given to the nonfavored team. The "line" is subject to change as a given event approaches and a bookmaker may alter the "line" on a particular event in order to try and even out the money wagered on each side.

**4.** In *United States v. Thomas, supra,* 508 F.2d at 1202 n. 2 we defined "juice" as the ten percent commission the bookmaker is paid by the bettor, so that if an equal amount is bet on either side of each event, the bookmaker has a ten percent profit and loses nothing.

wife with line information, sports scores, and/or received bets. If Stovall did not have the current information, he would call back defendant or defendant's wife with the information. Stovall-Wald placed 139 calls to defendant's phone. Stovall stated defendant placed bets of five hundred dollars and one thousand dollars with the Stovall-Wald book.

Stovall testified that he did not know whether or not defendant was laying off bets,[5] and the jury heard expert testimony that lay off betting is seldom expressly referred to among people in the gambling business. Defendant argues that lay off betting is the major link connecting independent operations into a single effective gambling organization and is necessary for the purpose of finding the jurisdictional five members. *See United States v. Schaefer, supra,* 510 F.2d at 1311. Because there was no further testimony indicating whether this was lay off betting, defendant argues he was merely placing personal bets, and as a mere customer to Stovall-Wald he is excluded from the coverage of section 1955.

We first note the precise meaning and existence of lay off betting is often not clear.

> [B]ookmaking is not a precise science, * * * while the most common instance of lay off betting occurs when there is an imbalance of bets and wagers on a given sporting event, and while its usual effect is to distribute among various bookmakers the imbalance, thus minimizing the risk of substantial loss to any one bookmaker, one could not say, as a matter of law that such is the only instance of laying off.

*United States v. Turzitti,* 547 F.2d 1003, 1006 (7th Cir.), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977). Thus it

appears that while the evidence was not overwhelming, there were sufficient facts adduced at trial for the jury to reasonably infer that defendant was laying off bets.

Of course the existence of lay off betting is not necessary in determining that one gambling business exists for purposes of section 1955. The jury was properly instructed that the issue is to determine from the evidence as a whole whether the independent organizations were linked to one gambling business. As we stated in *United States v. Guzek,* 527 F.2d 552, 557–58 (8th Cir. 1975):

> [T]he mere placing of bets by one bookmaker with another or the mere furnishing of line information in and of itself may not be sufficient to establish the interdependence of the bookmakers so as to fuse them into one single business for the purpose of counting each of these participants toward the five persons necessary to establish a violation of § 1955.
>
> The relationships between the bookmakers must be closely analyzed to ascertain whether they are truly independent or whether their relationships serve to weld them into a single gambling business, usually centering on the monitored bookmaker. As we have noted in earlier cases, the existence of layoff betting, by which the profits of the gambling enterprise are shared and the risk of loss of each is reduced, *is an important factor* to be considered.

(emphasis added). Lay off betting is thus only a factor, albeit an important one, and its presence or absence is not necessarily controlling. Thus the jury could have concluded the entire relationship, though lacking proof of lay off betting, was nevertheless interdependent to the degree necessary to establish a single gambling enterprise.

5. In *United States v. Thomas, supra,* 508 F.2d at 1202 n. 2, "lay off" betting was defined as follows:

> To protect against losses, a bookmaker normally engages in "lay off" betting whereby he passes on to another bookmaker the amount of bets by which his own "book" is unbalanced; thus to the extent he loses to his

own customers, he wins back from the other bookmaker, or vice versa. The "lay off" bet is therefore, in effect, bookmaker's insurance or reinsurance. Bookmakers, however, can and commonly do place personal wagers with one another which are not "lay off" bets.

■ In any event, the statutory requirement of five individuals is present in defendant's business without tieing in the other gambling businesses in Arkansas cities which were associated with the Stovall-Wald operation. The jury could have concluded from the evidence that defendant operated a single illegal gambling business in violation of section 1955, which included Stovall and Wald (who pled guilty to the charge), defendant, defendant's wife, and Bob McCabe. Clearly defendant's wife, who placed bets with Stovall-Wald, obtained line information and generally acted for defendant is defendant's agent in the business. So too is McCabe who allowed his home to be used as a place for the payment and collection of wagers, with McCabe actually paying bets for defendant. They were "conducting" the business as that word is used in the statute.[6] "Congress' intent was to include all those who participate in the operation of a gambling business, regardless [of] how minor their roles and whether or not they [are] labelled agents, runners, independent contractors or the like, and to exclude only customers of the business." *United States v. McHale,* 495 F.2d 15, 18 (7th Cir. 1974).

We are satisfied from our examination of the record that there was sufficient evidence to support the conviction on Count I of the indictment.

## II. Counts 39 and 40

Counts 39 and 40 of the indictment charged that the defendant used wire communication facilities for the transmission in interstate commerce of information assisting in the placing of bets or wagers on sporting events in violation of 18 U.S.C. § 1084(a).[7] The evidence in support of Count 39 established that in the latter half of July 1977, defendant placed several calls over the telephone from Fort Smith, Arkansas, to a Los Angeles, California sports in-

formation service which provided recorded game scores for various sports. The proof in support of Count 40 showed that on October 1, 1977, defendant placed similar telephone calls to a New York sports information service which provided recorded stories about general sports news, game scores, and fast breaking news on all general sports information.

Defendant challenges his conviction for violating section 1084(a) on three grounds. (1) "Transmission" as used in section 1084(a) applies only to the sending, and not receiving of information; (2) defendant, at the time of the calls, was not engaged in the business of betting or wagering; and (3) the information received could not assist in the placing of bets or wagers on sports events.

■ Defendant's first contention that his calls to the sports information services did not involve a "transmission" is based upon *United States v. Stonehouse,* 452 F.2d 455 (7th Cir. 1971). That case does support defendant's contention here. In *Stonehouse,* the defendant used a Western Union ticker tape machine to obtain interstate communications concerning gambling information. The court held that "transmission" as used in 18 U.S.C. § 1084(a) was not intended to encompass the mere reception of information and reversed the conviction for that reason. However, this circuit has indicated the use of a telephone in the interstate communication of wagering information does violate 18 U.S.C. § 1084(a), see *Truchinski v. United States,* 393 F.2d 627 (8th Cir.), cert. denied, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d 103 (1968), and we conclude the prevailing view is that "the statute forbids the use of interstate facilities for sending *or receiving* wagering information." *United States v. Pezzino,* 535 F.2d 483, 484 (9th Cir.), cert. denied, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976)

---

**6.** See note 2 and accompanying text *supra.*

**7.** 18 U.S.C. § 1084(a) provides:

Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, * * * shall be fined not more than $10,000 or imprisoned not more than two years, or both.

(emphasis added). *Accord, United States v. Sellers,* 483 F.2d 37, 44–45 (5th Cir. 1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974); *United States v. Tomeo,* 459 F.2d 445 (10th Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 232, 34 L.Ed.2d 175 (1972); *Sagansky v. United States,* 358 F.2d 195 (1st Cir. 1966). *See also* E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 61.18 (1977) ("a 'wire communication facility' would include long distance telephone facilities; and information conveyed or received by telephone from one state into another state * * * would constitute a transmission in interstate * * commerce * * * .").

We conclude that there was sufficient evidence of a transmission under the statute.

Defendant's second contention regarding Counts 39 and 40 is that he was not in the business of betting or wagering, as required by section 1084(a), at the time of the telephone calls. The Los Angeles calls were placed from July 17, 1977 through July 29, 1977, and the New York call on October 1, 1977. The defendant's telephone toll records were introduced at trial, which indicated 728 calls to Stovall-Wald and 139 calls from Stovall-Wald in the period from May 1977 through January 1978. Defendant was taking bets at this time, Bob McCabe and George Richardson testified they were betting with defendant in 1977. Officer Hartman was betting with defendant on October 1, 1977, the same day as the telephone call to the New York service was placed. On October 11, 1977, defendant was arrested by Fort Smith police and a racing form and line sheets were seized. From this evidence the jury could conclude that defendant was engaged in continuous activity characterized as the business of betting or wagering. There is no requirement that defendant be exclusively engaged in the business of betting or wagering. *Truchinski v. United States, supra,* 393 F.2d at 630. It is our view that the evidence of telephone records indicating that calls were placed from a telephone service in defendant's name, and the fact

that the records for the period did not reflect any requests for credits for calls allegedly not made to the sporting services, is sufficient evidence for the jury to conclude that defendant placed the calls.

Defendant's final contention concerning Counts 39 and 40 is that he could not have received information from the services which could assist in the placing of bets or wagers. The president of the New York service testified the service provided sports scores of games in progress, final scores, overnight wrap-up stories, and general late breaking sports news including features on the best pick in certain games. The owner of the Los Angeles service testified his service provided sports scores for various sports. The jury was properly instructed they could draw reasonable inferences from the facts, and certainly the evidence adduced was adequate to show the recorded information, whether it concerned stories on the status of athletes, picked game favorites, or simply provided scores, could assist the defendant in the placing and accepting of bets and wagers.

### III. Severance

Defendant argues that the district court erred in failing to grant his motion for severance. Defendant states that Sam Sexton, the attorney for co-defendant Cox, was precluded by ethical and tactical considerations from giving exculpatory testimony in favor of defendant. Sexton, according to his affidavit, was willing to testify that in 1978 an F.B.I. agent had discussed Reeder's situation with him, the agent stating that the F.B.I. was satisfied Reeder was not violating any federal laws in his bookmaking activities; that his bookmaking business was not associated with the gambling concerns of others. The affidavit stated Sexton would testify to this if his client Cox was not on trial at the same time, otherwise the code of ethics would forbid him from testifying at the trial of his client.

The Code of Professional Responsibility does not preclude Sexton's testifying under all circumstances. *See* ABA

Code of Professional Responsibility, EC 5–9 and 5–10. Since Sexton knew before trial he might be called as a witness, if he felt the testimony would hurt his client it would have been proper to withdraw as counsel for Cox. *See* EC 5–10 ("[w]here the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate."). ABA Code of Professional Responsibility, DR 5–102(B) allows Sexton to continue representation until it appears his testimony is or may be prejudicial to his client. While it is unclear why this testimony would be prejudicial, in any event Sexton could have been called as a witness if Reeder or his counsel felt it necessary. Fed.R. Evid. 615(3) clearly would allow Sexton to remain present in the courtroom as an exception to the exclusionary rule for witnesses.

 The question of prejudice resulting from joinder is addressed to the sound discretion of the trial judge, and will not be reversed except on a finding of clear prejudice or an abuse of discretion. *United States v. Riley,* 530 F.2d 767, 770 (8th Cir. 1976). In the present case all of the offenses charged were of the same or similar character. All the defendants at trial were charged in Count I for activity arising out of acts connected to the operation of an illegal gambling business. Considering the similarity of the offenses, and the overlapping evidence, joinder was proper. Additionally, we note that, although subpoenaed, Sexton was not called as a witness. We can find no abuse of the trial court's discretion, nor evidence of clear prejudice resulting from the denial of defendant's motion for a severance.

The convictions of defendant on all three counts are affirmed.