UNITED STATES of America, Appellee,

v.

Matthew TRUPIANO, Appellant.

No. 93–1264.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 15, 1993.

Decided Dec. 8, 1993.

Irl Baris, St. Louis, MO, argued, for appellant.

David Rosen, St. Louis, MO, argued (Stephen B. Higgins, David M. Rosen and Joseph M. Landolt, on the brief), for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Matthew Trupiano, a former official of a laborers local, was charged in a multi-count indictment alleging wagering-related violations as well as embezzlement of union funds. Trupiano was convicted by a jury on one count of operating an illegal gambling business in violation of 18 U.S.C. § 1955, and was acquitted on all other counts. He raises a number of issues on appeal, only three of which deserve extensive discussion. Those issues are: (1) whether there is sufficient evidence to show that Trupiano was guilty of operating an illegal gambling business under 18 U.S.C. § 1955; (2) whether audio and video tapes were properly admitted; and (3) whether the sentencing guidelines were properly applied by the district judge. After a careful review of the record and briefs, we affirm on all issues.

*I.   18 U.S.C. § 1955*

A. Requirement that there be an illegal gambling business in violation of state law.

■ The first and essential element for a prosecution under 18 U.S.C. § 1955 is the existence of an "illegal gambling business" in violation of state law. *See* 18 U.S.C. § 1955(b)(1)(i). Trupiano argues that there was no violation of the relevant Missouri law, section 572.030, because card playing is not prohibited under that code section and because there was no "rake." Therefore, he argues, there can be no violation of section 1955.

Section 572.030 of the Missouri code in pertinent part provides that:

1. A person commits the crime of promoting gambling in the first degree if he knowingly advances or profits from unlawful gambling or lottery activity by:

(1) Setting up or operating a *gambling device* to the extent that more than one hundred dollars of money is gambled upon … in any one day.…

Mo.Ann.Stat. § 572.030 (Vernon 1979) (emphasis added). Although the language of section 572.030 does not include the words "card games" or "cards," the statute clearly was intended to prohibit commercial gambling in the form of card playing. The comments to section 572.030 specifically define "gambling device" as inclusive of dice or card games. *See* Mo.Ann.Stat. § 572.030, Comment to 1973 Proposed Code ("Subsection 1(1) retains Missouri's felony penalty for setting up and operating any gambling device … [which] includes setting up and operating a dice or card game."). Missouri's courts have interpreted this and the code provisions that preceded it similarly.[1]

Trupiano's contention that there was no illegal gambling business because there was no "rake" is equally unpersuasive. A "rake" exists when operators of the game take a portion of the wages or profits to cover expenses regardless of who wins or loses. The relevant statutory sections do not require that a rake exist for there to be unlawful

---

1. *See State v. Blanchard*, 326 Mo. 965, 33 S.W.2d 937 (1930); *State v. Williams*, 273 S.W. 1069 (Mo.1925); *State v. Solon*, 247 Mo. 672, 153 S.W. 1023 (1913).

gambling activity, nor have the Missouri courts held that to be the case.[2]

What the Missouri statute does require and what the evidence shows is that Trupiano was an operator of and principal player in a rather sophisticated "gin rummy" card playing operation involving a number of people. The operation was hardly the "friendly poker game" in a person's house or country club the defendant suggests it was. A player could win or lose as much as $5,000 in a single game. Unlike a casual card game among friends, "customers" were solicited, in part based upon the perception of key participants or partners of "the corporation," that their player could beat the customers.[3] New customers were introduced to the game by partners of the corporation who were paid for that service. Access to the game was strictly limited to select persons.

Trupiano, in addition to being a principal, very skilled card player, set up games (among other places, in the back room of an auto sales lot) and attempted to collect debts. Working closely with and for him were nine other people who were assigned the separate tasks of bringing in new card players, setting up games, shuffling cards, providing a location for the games, collecting debts, providing security, and handling banking matters.

While the main participants took no cut off the top of the profits (a "rake"), they did have a system for splitting all of the profits. If the customer was one who had played the corporation before Trupiano became involved, the profits were split evenly between Trupiano and Genaro "Jan" Mazzuca. If the customer was one who began to play the corporation after Trupiano became involved,

sixty percent of the profits went to Trupiano, and forty percent went to Mazzuca. In either case, Mazzuca was then required to pay at least three other participants from his share of the profits. Thus, even though Trupiano did not personally pay the other key participants for their services from his share of the profits, it is clear that Mazzuca paid these individuals from his share with the full knowledge and consent of Trupiano.[4]

**B. Requirement that five or more persons be involved.**

Section 1955 requires that, in addition to violating state law, the illegal gambling business involve "five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." 18 U.S.C. § 1955(b)(1)(ii). Congress's intent in including this requirement was to exclude mere customers or bettors from the reach of the statute. *United States v. Bennett,* 563 F.2d 879, 881 (8th Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977); *United States v. Schaefer,* 510 F.2d 1307, 1311 (8th Cir.), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975).

Our court has read broadly the scope of section 1955's requirement that five or more individuals "conduct, finance, manage, supervise, direct, or own all or part of" the illegal gambling business. *See United States v. Reeder,* 614 F.2d 1179, 1182 (8th Cir.1980) ("The scope of section 1955 is broad and excludes only customers of the business."). The jurisdictional five persons may include *unindicted and unnamed persons. Id.* The violator need not know that the

---

2. Trupiano's reliance on *United States v. Rieger,* 942 F.2d 230 (3d Cir.1991), is misplaced. *Rieger* does not stand for the proposition that a rake is essential to prove an illegal gambling operation. Rather, the Third Circuit in dicta noted that rakes may exist in *both* illegal and legal gambling operations. Whether or not the activity is legal depends on how the rake is used: "In games *not* part of an illegal gambling business, the 'rake' is applied to defray expenses (refreshments, decks of cards, and the like) with the remaining amount of money, if any, distributed evenly among the players." *Id.* at 232 (emphasis added).

3. The main participants involved in the game called their group the "corporation." The people against whom they played were referred to as "customers."

4. We find Trupiano's argument that because he did not split his share of the profits with any of the other participants apart from Jan Mazzuca, he therefore was not operating an unlawful gambling business to be disingenuous. Although Trupiano did not pay outright the other participants from his share of profits, he was fully aware of and concurred in Mazzuca's arrangement with several of the participants to pay them for their services with Mazzuca's share of the earnings.

activity engaged in was composed of five or more participants. *Id.; Schaefer*, 510 F.2d at 1311. Section 1955 requires only that the involved person "conduct" the business,[5] which allows a person to be counted who contributes to the gambling operation without having any control over it. *Reeder*, 614 F.2d at 1182; *Bennett*, 563 F.2d at 882.

■ There is no question but that the defendant can be counted as among the five necessary persons. Evidence was adduced at trial that showed that Trupiano, in addition to being one of two main card players, exercised substantial control over the card playing business. He was involved in management decisions on the day-to-day operations of the game, set up games for the group, decided who would play, and attempted to collect debts.

Along with Trupiano, Jan Mazzuca was the principal card player for the business. In addition to playing cards, he set up games, located customers, accepted winnings, collected debts, and handled banking matters. He received the balance of the profits of the operation not taken by Trupiano, and split his share with several of the other key participants.

Others receiving pay from Jan Mazzuca for their services were Joe Mazzuca, Lloyd Christopher, and Joe Burnett. Joe Mazzuca, Jan Mazzuca's brother, helped in splitting the monies, handled banking matters, assisted in setting up games for Trupiano, shuffled cards, and kept score. Lloyd Christopher was the owner of the car dealership where the games were played and participated in the games. He also accepted winnings, set up games, and handled banking matters. Joe Burnett recruited customers for the games. For this he received a payment from Jan Mazzuca equal to a percentage of the loss of the player he introduced.

Rich Bossi was an employee of the auto sales lot. He was the doorkeeper for the game and kept out those who had not been approved to play. He also helped set up games and collected debts. Dominic Monti shuffled cards for the games and was also paid for his services.

The jury could have concluded from the evidence that Trupiano, Jan Mazzuca, Joe Mazzuca, Lloyd Christopher, Joe Burnett, Rich Bossi, and Dominic Monti each performed acts, functions, or duties that were necessary to or helpful in the ordinary operation of the business. Section 1955's "five-person" requirement was therefore easily satisfied.

C. Requirement that the business remain in "substantially continuous operation" for 30 days or more.

■ Section 1955 lastly requires that the illegal gambling business be "in substantially continuous operation for a period in excess of thirty days or ha[ve] a gross revenue of $2,000 in any single day." 18 U.S.C. § 1955(b)(1)(iii). Relying on trial testimony from Ted McKinney, an undercover informant, that "it was sort of sporadic" as to when the games were played, and that "it wasn't just a continuous event that you played every day," Tr. at 550, Trupiano argues that the statutory element of a "substantially continuous operation" has not been met. His argument is without merit.

■ In enacting section 1955, Congress did not purport to require absolute or total continuity in gambling operations. *United States v. Nerone*, 563 F.2d 836, 843 (7th Cir.1977). Consistent with this, "substantially continuous" has been read not to mean every day. *Id.* The operation, rather, must be one that was conducted upon a schedule of

5. The jury was instructed on the meaning of "conduct" as follows:

The term "conduct" as it is used in connection with the gambling business means to perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business. A person may be found to conduct a gambling business if he has a part in the management or control of the business or has a share of the profits, however, a person may also be found to conduct a gambling business even though he is a mere servant or employee, having no part in the management or control of the business and no share in the profits.

A mere bettor or customer of a gambling business cannot properly be said to conduct the business, but people who deal or shuffle the cards or who act as guards or lookouts may be found by you to conduct the business. Jury Instruction No. 17.

regularity sufficient to take it out of the causal nonbusiness category. *Id.* at 844; *see also United States v. Scavo,* 593 F.2d 837, 841 (8th Cir.1979) ("In enacting § 1955, Congress did not intend to make all gambling businesses subject to federal prosecution; rather the statute was 'intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern.'" (citation omitted)). The evidence was plainly sufficient to meet this test.

The card game had been running for a long time when Trupiano became involved in March of 1989. Ted McKinney, the government informant, first met Trupiano on June 29, 1989.[6] He played Trupiano for the first time on July 18, 1989, and thereafter on July 21 and 27, August 3, 10, 15, and 22.[7] All told, he lost $6,700 to the corporation during this time. In the thirty days beginning on January 2, 1990, and ending on February 1, 1990, McKinney played the corporation four more times, losing $8,300. During this period, a host of activities occurred that evidence the continuous nature of the card playing operation. Among other things, attempts were made both to get old customers to play and to find new ones. Payments were received, profits were split, and attempts at collecting debts were made. Trupiano and the other key participants in the operation were involved almost on a daily basis in activities related to the functioning of the corporation.

We are satisfied from our examination of the record that there was sufficient evidence to support Trupiano's conviction under 18 U.S.C. § 1955.

## II. Admissibility of Tapes

■ Trupiano next argues that the district court abused its discretion in failing to conduct the appropriate inquiry concerning the admissibility, use, and accuracy of numerous audio and video tapes that the government planned to use at trial. Accordingly, he argues, the court's denial of his motion for a continuance to resolve these issues is reversible error. We disagree.

The defendant and his counsel without doubt had a sizeable task before them in reviewing all of the audio and video tapes submitted by the government. The investigation of Trupiano and those individuals indicted with him produced a plethora of tapes intended for use in the government's case. Over 250 audio tapes and six video tapes were made available to the defendants as early as December 1991—some ten months before trial. Each defendant also received numerous logs consisting of the handwritten notes of the monitoring agents regarding the substance of the taped conversations.

Trupiano admits to having received copies of the tapes in January 1992. He also admits that he began to review the tapes around that time. His objection concerning the admissibility of the tapes is that the government did not designate the conversations that it planned to offer into evidence until a couple of weeks before trial, leaving him to speculate which conversations would be used.[8]

■ Admissibility questions are within the sound discretion of the trial court and will not be reversed unless there has been a clear abuse of discretion. *United States v. Miller,* 994 F.2d 441, 443 (8th Cir.1993). After a careful review of the record, we find that the district court did not abuse its discretion in denying the motion for continuance and admitting into evidence the audio and video tapes. Trupiano had ample opportunity to review the tapes in advance of trial. By his own admission, he had begun reviewing the tapes early in the preparation of his case to identify those tapes from which he might benefit and presumably those the govern-

---

**6.** Before he met Trupiano, McKinney had already played against the corporation a couple of times.

**7.** During this time period, at least one other regular customer, Frank Bommarito, played against the corporation for gin rummy debts totaling $12,800.

**8.** On September 17, 1992, Trupiano received from the government a proposed stipulation and a list of 106 conversations it intended to use at trial. The trial began on October 5.

ment was most apt to use. Although the government did not designate the conversations it intended to enter into evidence until a couple of weeks before trial, Trupiano had reviewed most of the tapes before then and could reasonably have been expected to know what the government would focus on at trial. Significantly, Trupiano nowhere states or otherwise suggests in his brief that he was prejudiced by the use of the tapes at trial.[9]

### III.  Sentencing Issues

The defendant lastly raises several challenges to the trial court's sentencing of him. We affirm on each of the points he raises.

### A.  Double-counting.

■ Trupiano first argues that the district judge impermissibly added four levels to his base offense level of 12 for being an "organizer or leader of a criminal activity that involved five or more participants" pursuant to U.S.S.G. § 3B1.1. In so doing, he argues, the court "double-counted" for the same factor of "five or more participants" since an essential element of the offense under which he was charged is that the illegal gambling business involve five or more persons. We find his argument to be without merit.

■ The trial court imposed an upward adjustment under section 3B1.1(a) because it found that Trupiano was an *organizer* or *leader* of criminal activity involving five or more participants, not because the organization contained five or more participants. In-

deed, the thrust of section 3B1.1 is that an increase in a person's base offense level is warranted if a person takes a leadership position. The adjustment in the present case clearly was not made because there were five or more persons involved in the crime, but rather because the defendant was an organizer or leader of the criminal activity. The enhancement thus was not impermissibly "based upon conduct that was coterminous with the conduct for which [Trupiano] was convicted."[10]  *United States v. Lamere,* 980 F.2d 506, 516–17 (8th Cir.1992).

■ Trupiano's contention that it was error for the district court to deny him an opportunity to cross-examine certain witnesses at his sentencing hearing whom he claims would have testified that his role in the illegal gambling business was minimal is also without merit. The defendant was able to develop fully the testimony of four of seven witnesses who testified at the sentencing hearing as to his nonsupervisory role in the illegal gambling business. The remaining three witnesses refused to testify on Fifth Amendment grounds, and were promptly excused by the court. Trupiano was in no way prejudiced by the court's dismissal of these witnesses. Having listened to hours of tapes which included conversations of these witnesses discussing the defendant's role, the judge had more than sufficient information on which to base his sentencing decisions.

### B.  Acceptance of responsibility.

■ Trupiano attacks his sentence next by asserting that the district court erred by

---

9. Trupiano cites no instances where he was foreclosed from timely objecting to the use of the tapes on account of their lack of clarity or lack of a proper frame of reference. To the extent he relies on *United States v. Bell,* 651 F.2d 1255, 1258–59 (8th Cir.1981), as standing for the proposition that it is incumbent upon trial court judges to examine tapes prior to trial as a matter of course whenever there is any question as to the quality of tapes, his reliance is misplaced. The court in *Bell* addressed the narrow issue of the proper role of trial judges in determining the admissibility of tape recordings that contain inaudible portions. *Id.* at 1259. The defendant does not allege that the tapes in the present case were inaudible, nor could he, it appears. The trial judge remarked on a number of occasions in response to objections by Trupiano that the tapes and transcripts were "very clear," in fact, "about

the clearest [he had] ever heard." II Tr. at 446; IV Tr. at 774.

10. We likewise reject Trupiano's argument that the trial court's imposition of three points to his criminal history category pursuant to guideline sections 4A1.1(d) and (e) for committing the instant offense while on parole for another offense is "another type" of double-counting. Parole revocation is a fundamentally different and altogether separate process from that of the imposition of a new sentence for a new crime. *See Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972) (revocation of parole is not part of a criminal prosecution); *Standlee v. Rhay,* 557 F.2d 1303, 1306 (9th Cir. 1977) ("It is well-established that parole revocation is not part of a criminal prosecution.").

denying him a two-level decrease for acceptance of responsibility pursuant to section 3E1.1. Although this adjustment is not ordinarily intended to apply to a defendant who puts the government to the burden of proof at trial, reduction may occur, he argues, for a defendant who "challenges the applicability of a statute to his conduct." U.S.S.G. § 3E1.1, application note 2.

We might be more sympathetic to Trupiano's claim that he accepted responsibility but for the fact that he did not admit to any of the essential elements of operating an illegal gambling business under 18 U.S.C. § 1955. In spite of the substantial evidence the government amassed against him, he at no time before, during, or after trial admitted to any of the conduct the government sought to prove.[11] The closest he came to accepting responsibility was not denying that he participated in card games.

■ A district court has discretion to reduce a defendant's offense level if the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct. U.S.S.G. § 3E1.1(a); *United States v. Lublin,* 981 F.2d 367, 370 (8th Cir.1992). The court's decision on this issue will be reversed on appeal only if clearly erroneous. *United States v. Adipietro,* 983 F.2d 1468, 1474 (8th Cir.1993); *Lublin,* 981 F.2d at 370; *United States v. Miller,* 951 F.2d 164, 165 (8th Cir. 1991). For the reasons stated above, we find that the trial court's refusal to grant Trupiano's request for a two-level reduction for acceptance of responsibility was not clearly erroneous.

**C. Downward departure.**

■ Finally, Trupiano challenges his sentence on the grounds that the district court refused to grant him a downward departure. This court has repeatedly held that the exercise of discretion by a district court to refuse to depart downward is nonreviewable. *United States v. Mahler,* 984 F.2d 899, 903 (8th Cir.1993); *United States v. Evidente,* 894 F.2d 1000, 1003 (8th Cir.), *cert. denied,* 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990). Accordingly, we cannot consider Trupiano's challenge to the district court's discretionary refusal to depart downward.

### IV. Conclusion

We find that the evidence was sufficient to show that Trupiano was guilty of operating an illegal gambling business under 18 U.S.C. § 1955, that the audio and video tapes were properly admitted, and that the sentencing guidelines were properly applied. Accordingly, we affirm on these issues as well as the other issues Trupiano raises on appeal that, after careful review, we have determined not to merit discussion.[12]

---

11. Indeed, Trupiano's steadfast denial of any acceptance of responsibility continued right up to sentencing where he stated that he was being "convicted of a crime that in [his] heart [he knew he] did not commit." Sentencing Tr. at 103.

12. These issues are: (1) whether the electronic surveillance was properly authorized; (2) whether the district court erred in failing to provide meaningful production of material pursuant to the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) whether the district court erred in refusing to grant the defendant a continuance of his trial; (4) whether the government's undercover informant should have been barred from testifying because of his agreement with the government committing him to create crimes and testify in behalf of the government in return for payments and complete immunity for himself and his family; (5) whether the district court erred in refusing to order the production of personnel records of government agents; and (6) whether the prosecution of the defendant should have been barred because he was the subject of vindictive and selective prosecution by the government.