# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3688
No. 05-3691

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee/ | * |
| Cross-Appellant, | * |
| | * |
| v. | * |
| | * |
| Susan Bala, | * |
| | * |
| Defendant - Appellant/ | * |
| Cross-Appellee. | * |

_____

No. 05-3690

_____

Appeal from the United States
District Court for the
District of North Dakota.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Racing Services, Inc., | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: September 28, 2006
Filed:  March 6, 2007

_____

Before LOKEN, Chief Judge, SMITH and GRUENDER, Circuit Judges.
_____

LOKEN, Chief Judge.

After a lengthy trial, the jury convicted Racing Services, Inc. (RSI), and its president and sole shareholder, Susan Bala, of conducting and conspiring to conduct an illegal gambling business in violation of 18 U.S.C. §§ 1955 and 371; illegal transmission of wagering information in violation of 18 U.S.C. § 1084(a); and eight counts of money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(h). For forfeiture purposes, the jury subsequently found the amounts involved in each defendant's illegal gambling and money laundering offenses -- $99,013,200 as to RSI and $19,719,186.06 as to Bala. The district court sentenced Bala to 27 months in prison, ordered her to forfeit $19,719,186.06, and held her jointly and severally liable for RSI's forfeiture of $99,013,200. Bala appeals, arguing that the evidence was insufficient and a number of other issues. RSI, now represented by its bankruptcy trustee, joins in these contentions. Both defendants also challenge the forfeiture orders. Concluding the evidence was insufficient on all counts, we reverse.

## I. Background.

In 1989, the State of North Dakota legalized parimutuel wagering on horse races conducted outside the State and simulcast (simultaneously broadcast) to licensed off-track betting ("OTB") operators in North Dakota. The North Dakota Racing Commission (the "Commission") administers this heavily regulated regime. Only charities and other "public-spirited organizations" may be licensed to conduct simulcast parimutuel wagering. See N.D. Cent. Code § 53-06.2-06.

In 1993, RSI became the sole entity licensed by the Commission to provide simulcast services to the charities licensed as OTB operators. RSI as simulcast service

provider contracted with out-of-state race tracks to provide satellite broadcast signals of live racing events to licensed OTB locations in North Dakota. RSI also established and maintained the combined parimutuel pools of North Dakota wagers and performed many record-keeping functions.

In 2001, Bala, the Commission, and interested North Dakota constituents such as horse breeders and the racing industry persuaded the North Dakota Legislature to amend its parimutuel wagering statutes to permit parimutuel "account wagering." Before account wagering, parimutuel bettors placed bets with OTB operators before the simulcast horse race, usually appearing in person and paying the OTB operator's teller in cash. The various wagers were combined into a parimutuel pool. After the race, approximately 80% of the pool was paid to winning bettors. The remaining 20% was divided between the race track, the OTB operator, North Dakota taxes and fees, and RSI, the simulcast service provider. With account wagering, bettors may establish accounts and place simulcast parimutuel wagers electronically, eliminating the need for cash-handling tellers. Rather than authorize multiple OTB operators to establish bettor accounts and receive account wagers, the account wagering statute provided that account wagers "may only be made through the licensed simulcast service provider," RSI. N.D. Cent. Code § 53-06.2-10.1. The way RSI conducted account wagering resulted in this prosecution.

Following passage of the account wagering statute, RSI established a call center where RSI employees received bets from callers with wagering accounts. After receiving a bet, the employee would charge the customer's account and enter the bet into a "tote machine," the same equipment used to transmit bets placed with OTB operators to the race track and to calculate the combined parimutuel pool for that race. RSI moved this operation from its Fargo headquarters, where charities licensed as OTB operators were already conducting simulcast parimutuel wagering, to a building at 1318 23rd Avenue South in Fargo (referred to by the parties as "1318"). The indictment charged and the government's evidence at trial tended to prove that,

between October 1, 2002, and April 28, 2003, $99,013,200 was wagered through the 1318 call center, yet RSI paid no part of these wagering proceeds to the State in the form of incremental fees or taxes or to the charity OTB operators. When a disgruntled employee complained to the Commission that RSI was conducting "rogue" activities at the 1318 site, the FBI investigated and this prosecution followed.

## II. Sufficiency of the Evidence.

Defendants argue that the evidence was insufficient to sustain their convictions on all counts because it established that RSI's account wagering operation at 1318 was a legal parimutuel wagering business that at worst violated the Commission's licensing regulations. This contention raises difficult and complex issues, both factually and legally.

**Counts 1 and 2.** These counts charged RSI and Bala with conspiring to conduct and conducting an "illegal gambling business" within the meaning of 18 U.S.C. § 1955. This statute provides in relevant part:

> (a) Whoever conducts, finances, manages, [etc.] all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
>
> (b) As used in this section --
>
> (1) "illegal gambling business" means a gambling business which --
>
> (i) is a violation of the law of a State or political subdivision in which it is conducted . . . .

First enacted as part of Title VIII of the Organized Crime Control Act of 1970, § 1955 extended federal criminal jurisdiction to illicit gambling businesses of "major proportions," thereby giving the federal government "a new substantive weapon [to]

strike at organized crime's principal source of revenue: illegal gambling." <u>Iannelli v. United States</u>, 420 U.S. 770, 788-90 (1975) (quotation omitted). The statute does not broadly prohibit individual acts of gambling that are prohibited by state law. "It is participation in the gambling business that is a federal offense, and it is only the gambling business that must violate state law." <u>Sanabria v. United States</u>, 437 U.S. 54, 70 (1978). The issue is whether Bala, and the former RSI officers who pleaded guilty and testified against her, caused North Dakota simulcast service provider RSI to conduct an "illegal gambling business" within the meaning of § 1955.

1. A violation of § 1955 requires proof that the gambling business "is a violation" of state law. The government's lengthy indictment interpreted this element broadly, alleging that RSI's account wagering operations knowingly violated administrative regulations adopted by the Commission. In ruling on pretrial motions to dismiss, the district court rejected this broad interpretation of § 1955, correctly ruling that § 1955 only prohibits gambling businesses that are "in violation of state penal laws," not state administrative regulations. <u>United States v. Gordon</u>, 464 F.2d 357, 357-58 (9th Cir. 1972), followed by this court in <u>Missouri ex rel. Small v. Harrah's-N. Kan. City Corp.</u>, No. 99-1551, 2000 U.S. App. LEXIS 2022, at *3 (8th Cir. Feb. 15, 2000) (unpublished). Thus, weighing the sufficiency of the evidence on these counts requires a close look at North Dakota criminal laws relating to gambling.

A review of North Dakota's gaming laws must begin with Article XI, Section 25, of the North Dakota Constitution:

> The legislative assembly shall not authorize any game of chance . . . for any purpose whatever. However . . . <u>the legislative assembly may authorize</u> by law <u>bona fide</u> nonprofit veterans', <u>charitable</u>, educational, religious, or fraternal <u>organizations</u>, civic and service clubs, or such other public-spirited organizations as it may recognize, <u>to conduct games of chance when the entire net proceeds of such games of chance are to be devoted to</u> educational, <u>charitable</u>, patriotic, fraternal, religious, <u>or other public-spirited uses</u>.

(Emphasis added.) Consistent with this provision, the North Dakota criminal laws include a broad gambling prohibition: "Except as permitted by law . . . [a] person is guilty of a class C felony if that person engages or participates in the business of gambling." N.D. Cent. Code § 12.1-28-02(3).

The statutes authorizing simulcast parimutuel wagering create a limited exception to this broad prohibition: "Civic and service clubs; charitable, fraternal, religious, and veterans' organizations; and other public-spirited organizations may be licensed to conduct racing and simulcast parimutuel wagering as authorized by this chapter." N.D. Cent. Code § 53-06.2-06. The government argues on appeal, as it did to the district court, that RSI and Bala violated § 12.1-28-02(3), and therefore were properly convicted of violating § 1955, because neither was a charitable organization eligible to be licensed to conduct simulcast parimutuel wagering.

The district court rejected this theory and so do we. As the court recognized, the 2001 statute that authorized account wagering expanded the exception for simulcast parimutuel wagering:

> [P]arimutuel wagering [may] be conducted through account wagering. . . . <u>An account wager made on an account established in this state may only be made through the licensed simulcast service provider authorized by the commission to operate the simulcast parimutuel wagering system under the certificate system.</u> An account wager may be made in person, by direct telephone communication, or through other electronic communication in accordance with rules adopted by the commission.

N.D. Cent. Code § 53-06.2-10.1 (emphasis added). This statute expressly granted the licensed simulcast service provider, RSI, *exclusive* right to conduct account wagering, without an additional license but subject to rules of the North Dakota Racing Commission (rules that the Commission for the most part never adopted). Thus,

account wagering conducted by RSI became a "legal gambling business" in North Dakota, whether conducted at 1318 or elsewhere.

2. The parimutuel statutes also prescribe how the simulcast service provider must distribute the proceeds of an account wagering operation. After paying qualifying expenses, the provider "shall use the remainder of the amount so withheld [from the wagering pool] only for eligible uses allowed to charitable gambling organizations." N.D. Cent. Code § 53-06.2-11(5). The cross reference is to a statute that restricts the use of wagering proceeds by a charity licensed as an OTB operator, restrictions consistent with Article XI, Section 25, of the North Dakota Constitution, as one would expect. See N.D. Cent. Code § 53-06.1-11.1(2). A violation of this statute is a crime -- specifically, a class A misdemeanor. See § 53-06.1-16(1). Thus, a simulcast service provider such as RSI that fails to use its "net proceeds" in the manner prescribed by the North Dakota Constitution violates a penal statute. The district court's jury instruction on account wagering explained that, while RSI was authorized to take account wagers, "North Dakota law still requires that some portion of the proceeds of these wagers go to a charitable organization." Consistent with this analysis, the court denied Bala's post-verdict motion for acquittal of the § 1955 charges because:

> No defendant offered any evidence that any proceeds from the 1318 operation went to a charity during the October 2002 through April 2003 time period. Therefore, Defendant cannot claim that her gambling activity at 1318 . . . was legal under North Dakota law.

In our view, while the court's evidentiary observation was correct, its legal conclusion overlooked the government's affirmative failure to prove that this arguable non-compliance with state law converted defendants' authorized account wagering into an "illegal gambling business" within the meaning of 18 U.S.C. § 1955.

3. We note first that, to prove a criminal violation of N.D. Cent. Code § 53-06.1-11.1(2), the government must prove that RSI failed to "disburse net proceeds [to one or more charities] within the period prescribed by rule." Prior to and during the period in question, the Commission had *no* rules in place either defining account wagering net proceeds or prescribing how or when RSI must disburse its net proceeds to charity. The North Dakota constitutional term "net proceeds" is inherently vague. The parimutuel statute that cross references § 53-06.1-11.1(2) does not even use the term net proceeds. See § 53-06.2-11(5). The Games of Chance statutes define "net proceeds," but the definition is vague and may not apply to parimutuel horse racing revenues. See § 53-06.1-01(13).

At trial, the Commission's former executive director testified (for the government) that the portion of parimutuel wagering proceeds owed to charities was "a matter of free contract" between the charities and parimutuel licensees. "It can be as much or as little as they contract for in that there is no law or regulation that the Racing Commission says you must take this or you must accept this." In this uncertain regulatory environment, without Commission rules establishing a deadline for payment and the manner of calculating the amounts due to charity, the government's proof that RSI made no payments during its initial seven months of account wagering operations failed to prove a violation of § 53-06.1-11.1(2). And if defendants did not commit a criminal violation of § 53-06.1-11.1(2), their legal account wagering operations fell within the "Except as permitted by law" exclusion to a criminal violation of N.D. Cent. Code § 12.1-28-02(3).[1]

---

[1]We also note the indictment charged Bala and RSI with violating N.D. Cent. Code § 12.1-28-02(3) and various provisions of the North Dakota Administrative Code by operating an unlicensed simulcast parimutuel wagering site at 1318. As we have explained, this was a conceptually flawed theory. The indictment did not accuse defendants of violating § 53-06.1-11.1(2), nor did it allege that RSI unlawfully failed to pay its net proceeds to charity. In United States v. Miller, 774 F.2d 883, 885 (8th Cir. 1985), we reversed a conviction under 18 U.S.C. § 1955 because, by failing to specify what state gambling law the defendant violated, the indictment did not

4. Even if the government had proved a violation § 53-06.1-11.1(2) by establishing that RSI did not make one or more timely or adequate disbursements of account wagering net proceeds to charity, we would not affirm these § 1955 convictions. The statute defines an "illegal gambling business" as one which "is a violation" of state law. 18 U.S.C. § 1955(b)(1)(i). The word "is" strongly suggests that the government must prove more than a violation of some state law by a gambling business. *The gambling business itself* must be illegal. The legislative history supports this interpretation, stating that § 1955 was intended "to deal only with illegal gambling activities of major proportions." H.R. Rep. No. 91-1549 (1970), as reprinted in 1970 U.S.C.C.A.N. 4027, 4029; see United States v. Thomas, 508 F.2d 1200, 1204 (8th Cir. 1975).

Our prior § 1955 opinions have said the government need only prove that the gambling "violates state gambling laws," United States v. Sutera, 933 F.2d 641, 645 (8th Cir. 1991), or is "in violation of state law," United States v. Trupiano, 11 F.3d 769, 771 (8th Cir. 1993). But those cases involved forms of gambling that were flatly illegal under state law. See United States v. Shursen, 649 F.2d 1250 (8th Cir. 1981). In no prior § 1955 case have we dealt with an alleged violation where the core gambling activity was specifically authorized by state law but the manner in which defendant conducted that activity violated some aspect of state law. In this situation, we must identify those criminal violations of state law that turn a legal gambling business into an "illegal gambling business" that is itself a violation of state law.

In our view, it is clear that a criminal violation of a state law unrelated to gambling, such as a safety code or employment law violation, would not cause a legal

---

unambiguously set forth all elements of the offense and "contained no assurance that the grand jury deliberated on the elements of any particular state offense." Here, it appears that the grand jury deliberated on a purported gambling offense very different from the failure-to-pay-charities offense underlying defendants' § 1955 convictions. This violated the principles underlying our decision in Miller.

gambling business to violate § 1955. On the other hand, if RSI had intentionally violated § 53-06.1-11.1(2) by failing to pay its net proceeds to one or more charities for seven months, that would be a criminal violation of a state law regulating the manner in which gambling may be lawfully conducted. But that misdemeanor violation would not have made the gambling business itself illegal. Though it may be difficult in some cases to determine when a gambling-related violation is sufficient to make a legal gambling business illegal for purposes of § 1955, the text of the statute and its legislative history, supported by the rule of lenity to the extent those primary sources are ambiguous, require that the line be drawn. See generally Chapman v. United States, 500 U.S. 453, 463-64 (1991).

5. Assuming the theory was adequately charged in the indictment and explained in the jury instructions, the government could have avoided this evidentiary insufficiency by proving that RSI entered the account wagering business *never* intending to distribute its net proceeds to charity. A reasonable jury could then find that this form of account wagering business was itself illegal. But there was no direct or circumstantial evidence of such an intent or agreement. Two former RSI executives testified for the government, Vice President Raymundo Diaz and Chief Financial Officer Gary Storm. Diaz testified that the initial plans were to include a charity in the account wagering operations, and he assumed RSI made the appropriate arrangements. Storm testified that he was not aware of the account wagering operations at 1318 until months after they began. Bala testified that she told RSI officials charities must be involved in account wagering; that she believed the 1318 site was being used for internet wagering, which did not require charity involvement; and that she attempted to satisfy RSI's obligations to its OTB charities when she learned 1318 had conducted account wagering, but this prosecution thwarted those efforts. Given the lack of Commission rules prescribing the amounts RSI was required to pay to charities, the government's evidence fell far short of proving that RSI and Bala never intended to conduct the account wagering business in the manner prescribed by North Dakota's penal statutes.

For all these reasons, we conclude that the evidence was insufficient to convict Bala and RSI of the offenses charged in Counts 1 and 2.

**Count 3.** Count 3 charged defendants with violating 18 U.S.C. § 1084(a) when, being engaged in the business of betting and wagering, they knowingly made interstate wire transmissions of bets, wagers, "and information assisting in the placing of bets and wagers." Section 1084 provides an exception for "the transmission of information assisting in the placing of bets or wagers . . . from a State . . . where betting on that sporting event or contest is legal into a State . . . in which such betting is legal." 18 U.S.C. § 1084(b). The district court instructed the jury that defendants violated § 1084 if they transmitted "information assisting in the placing of bets and wagers," unless betting on the sporting event or contest was legal where the transmission was both placed and received.

North Dakota law expressly permitted RSI to conduct parimutuel wagering through account wagering using "telephone . . . or . . . other electronic communication." N.D. Cent. Code § 53-06.2-10.1. The district court nevertheless denied defendants' motion for judgment of acquittal on Count 3 on the ground that "[p]arimutuel wagering is only a legal activity when some proceeds are devoted to a charitable use." We conclude that this construction extended § 1084(a) beyond what the statute's plain language will permit. Transmitting information assisting in the placing of parimutuel account wagers was legal in North Dakota when RSI engaged in that activity. The betting in question was never illegal, only RSI's alleged use of the "net proceeds" of the betting long after the race was completed and winning bettors were paid. Thus, the electronic transmission of such information fell within the § 1084(b) exception unless the account wagers were placed from States where such wagering was illegal. As the government presented no evidence that ever occurred, the convictions on Count 3 must be reversed.

There is an aspect of this issue unnoticed by the parties that could have serious implications for the future of interstate account wagering. The prohibition in § 1084(a) encompasses bets and wagers as well as information assisting bets and wagers, whereas the exception in § 1084(b) is limited to information assisting bets and wagers. Thus, the plain language suggests that Congress intended to prohibit *all* interstate wagering by wire, whether or not legal in the States between which the bets are transmitted. There is explicit support for this interpretation in the legislative history. See H. Rep. No. 87-967 (1961), as reprinted in 1961 U.S.C.C.A.N. 2631, 2633. One unreported case reflects a federal indictment broadly construing § 1084 in this fashion, and the district court denying defendant's motion to dismiss. See United States v. Ross, No. 98 CR. 1174-1(KMV), 1999 WL 782749, at *3 (S.D.N.Y. Sept. 16, 1999). Two circuits have addressed the scope of the § 1084(b) exception without deciding this issue. See United States v. Cohen, 260 F.3d 68, 73-74 (2d Cir. 2001); Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc., 989 F.2d 1266, 1272-73 (1st Cir. 1993). Here, the trial record suggests that North Dakota passed the 2001 account wagering statute in an attempt to attract interstate electronic betting. If the reach of § 1084 is as broad as its legislative history suggests, the attempt if successful will violate federal law. We leave that issue to another day.

**Counts 4-12.** Counts 5-12 charged that defendants conducted specific financial transactions using the proceeds of an illegal gambling business for the purpose of promoting that business and concealing their unlawful activity, all in violation of the federal money laundering statutes, 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i); see generally United States v. Hildebrand, 152 F.3d 756, 762 (8th Cir. 1998). Count 4 charged a conspiracy to commit both offenses. A money laundering charge requires proof of a financial transaction involving the proceeds of "specified unlawful activity," which is defined to include violations of § 1955 and § 1084. See 18 U.S.C. §§ 1956(a)(1), 1956(c)(7)(A), 1961(1). The government persuaded the district court that the entire $99 million of account wagers were the proceeds of RSI's illegal

gambling business. However, as the government proved no violation of § 1955 or of § 1084, the convictions on Counts 4-12 must be reversed.

**The Forfeitures.** The indictment alleged that defendants must forfeit an amount equal to the gross receipts from RSI's account wagering activity -- $99,013,200 -- on account of their illegal gambling business and money laundering offenses. Congress has provided for the criminal forfeiture of property "used" in an illegal gambling business, 18 U.S.C. § 1955(d), or "involved" in money laundering, 18 U.S.C. § 982(a)(1). As to RSI, the jury found that the entire $99 million was involved in both offenses. As to Bala, the jury found a reduced amount, $19,719,186.06. The court's forfeiture order made Bala jointly and severally liable for the full $99 million. As we have reversed the illegal gambling business and money laundering convictions, the forfeiture orders must be reversed as well.

**The Government's Cross-Appeal.** The government cross appeals the district court's order permitting Bala to use some $68,000, proceeds from the sale of a house she purchased many years earlier, to pay the fees of her retained trial and appellate attorneys, rather than holding those funds in trust to satisfy a portion of the adverse forfeiture orders. This issue is moot because we have reversed the forfeiture orders. In any event, we agree with the district court's resolution of the issue.

### III. Conclusion.

The evidence at trial established that the North Dakota Racing Commission knew charities must receive the "net proceeds" of the account wagering that RSI, and only RSI, was authorized to conduct. Yet the Commission neither drafted regulations prescribing how this complex task should be accomplished nor adequately monitored RSI's compliance. Issues predictably arose. Rather than pursue possible violations in state court, the Commission brought the complicated situation to federal authorities, who then commenced a federal prosecution based upon flawed interpretations of state

law, of 18 U.S.C. § 1955, and of 18 U.S.C. § 1084. The result was a trial at which the government failed to prove any of the offenses charged. Accordingly, the judgments of the district court, including the preliminary and final orders of forfeiture, are reversed. Bala's motion to file additional pro se materials on behalf of RSI is denied as moot. The government's cross appeal is dismissed.

_____