UNITED STATES of America, Plaintiff,

v.

George E. SCHULTZ, et al., Defendants.

No. C 95–3011.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 20, 1996.

Janet L. Papenthien, Assistant United States Attorney, Sioux City, Iowa, for United States.

Jane Kelly, Assistant Federal Public Defender, Cedar Rapids, Iowa, for defendant George E. Schultz.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT SCHULTZ'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTIONS FOR NEW TRIAL**

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ....................1323

II. SCHULTZ'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL .......1324
 A. Standard Of Review ...............................................1324
 B. Reservation Of Rulings Pursuant To Fed.R.Crim.P. 29(b) ..................1326
 C. Schultz's Conviction Of Count One ......................................1327
 1. History and background of 18 U.S.C. § 1955 ..........................1327
 2. Inclusion in the jurisdictional five ...................................1328

3. The thirty-day alternative .........................................1329
4. The $2,000.00 in a day requirement .................................1331
5. Schultz's claims regarding the jurisdictional five ......................1331
 a. Paul Clergy, Gary Fall, and Tim Sapp ...........................1331
 i. Identification by account designation. .........................1331
 ii. Clergy, Fall, and Sapp as participants during the identified
 time period or on November 28, 1993. ........................1333
 iii. Lay off betting. ........................................1333
 iv. Exchanging line information.................................1334
 b. Harry Hull as one of the jurisdictional five persons.................1335
 i. Inclusion of Hull.........................................1335
 ii. Admissibility of Hull's statements............................1335
 c. Russ Kramer as one of the jurisdictional five persons...............1336
6. Summary of evidence supporting Schultz's conviction of Count One....1337
D. Schultz's Conviction Of Count Four ..................................1337

III. SCHULTZ'S MOTIONS FOR NEW TRIAL ...............................1338
 A. Admission Of Hull's Statements.......................................1339
 B. Admission Of Documentary Evidence.................................1339

IV. CONCLUSION ...........................................................1341

---

Defendant's post-trial motions seek reversal of his convictions, after an eight day jury trial, involving his operation of a gambling business in central Iowa. His motions warrant the court's consideration of whether the government's identification of members of a five-person gambling business, four of whom the jury included as participants in this business by mere account designations in defendant's records, suffices to sustain defendant's conviction of conducting an illegal gambling business in violation of 18 U.S.C. § 1955. In addition, defendant seeks a new trial on the grounds that statements by an alleged co-conspirator were improperly admitted. Defendant also asserts that much of the documentary evidence supporting the government's case was likewise improperly admitted into evidence because the government did not lay a proper foundation for this evidence. Although defendant failed to object to the admission of this evidence at trial, he alleges in his post-trial motion for new trial that the court committed "plain error" in admitting this evidence. The government has resisted defendant's renewed motion for judgment of acquittal and his motions for new trial.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

On May 4, 1995, Defendant George E. Schultz was indicted on three counts of a four-count indictment, involving alleged violations of 18 U.S.C. §§ 2, 371, 1952, & 1955.[1] The United States sought leave of court to dismiss Count Three of the indictment against George E. Schultz on October 13, 1995. The court granted the United States leave of court to dismiss Count Three against Schultz, and trial by jury began on October 17, 1995, on the remaining Counts One and Four of the indictment against Schultz.[2] In Count One of the indictment, Schultz was charged with conducting an illegal gambling business in violation of 18 U.S.C. § 1955. Count Four of the indictment charged Schultz with conspiring with other persons, known and unknown, to conduct an illegal gambling business or to use the telephone, a facility in interstate commerce, with intent to promote or carry on an illegal gambling business in violation of 18 U.S.C. § 371.

At the close of the government's evidence, Schultz moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure

---

1. In this four-count indictment, the grand jury charged Defendant Schultz, along with Defendants Harry V. Hull and William Dean Polking. However, only Counts One, Three, and Four of the indictment pertained to Schultz.

2. Defendant William Dean Polking was also charged with Counts One and Four of the indictment and was tried alongside Schultz in the same jury trial. Polking was acquitted of both counts of the indictment on October 30, 1995.

29 on both counts of the indictment. The court reserved ruling on this motion. At the conclusion of all the evidence, Schultz renewed his motion for judgment of acquittal on both counts, and the court once again reserved ruling on Schultz's motion. After eight days of trial, on October 30, 1995, the jury found Schultz guilty of both Counts One and Four of the indictment. In the verdict form, the court posed specific interrogatories to the jury, requiring the jury to either (1) identify a period of more than thirty days during which Schultz conducted an illegal gambling business in substantially continuous operation, or (2) identify the date on which the illegal gambling business conducted by Schultz had gross revenues of $2,000 or more for that particular day. In response to these specific interrogatories, the jury found, beyond a reasonable doubt, that Schultz had conducted an illegal gambling business which was in substantially continuous operation from November 1, 1993 to December 8, 1993. Although the verdict form did not require the jury to complete both these interrogatories, the jury also determined that on November 28, 1993, Schultz conducted an illegal gambling business which garnered gross revenues of $2,000 or more. In addition, the verdict form required the jury to identify by name or description the five or more persons, including the defendant, who were involved in the conduct of an illegal gambling business during either (1) the period of more than thirty days or (2) on the single day with gross revenues of $2,000 or more. In response to both alternatives, the jury identified the same six people: (1) Russ Kramer; (2) Harry Hull [sic]; (3) Paul Clergy; (4) Tim Sapp; (5) George E. Schultz; and (6) Gary Fall.

After the jury returned its verdict, Schultz renewed his motion for judgment of acquittal on the grounds that no reasonable jury could find the government proved beyond a reasonable doubt that Schultz conducted a gambling business involving the requisite five people under 18 U.S.C. § 1955, as charged in Count One. In addition, Schultz asserted that because the government failed to offer sufficient evidence of an agreement to commit an offense that, if completed, would violate federal law, no reasonable jury could convict Schultz of Count Four of the indictment. (Schultz's Memorandum, p. 2).

Schultz also moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, claiming most of the documentary evidence introduced at trial was improperly admitted, and that out of court statements made by Harry Hull which were used against Schultz were likewise improperly admitted into evidence. On November 20, 1995, the government filed a consolidated resistance to Schultz's motion for judgment of acquittal, his motion for new trial based on the improper admission of documentary evidence, and his motion for new trial based on the improper admission of Hull's out of court statements and subsequently filed a memorandum in support of its resistance. On December 18, 1995, Schultz filed a reply to the government's consolidated resistance. On January 25, 1996, the court ordered further briefing of the issue of the allegedly improper admission of documentary evidence. In compliance with the court's order, both Schultz and the government submitted supplemental briefs on that particular issue on February 5 and 6, 1996, respectively. With this procedural background in mind, the court turns to the consideration of Schultz's renewed motion for judgment of acquittal.

## II. SCHULTZ'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

Schultz has raised several issues in support of his renewed motion for judgment of acquittal. Before addressing these issues, the court must first determine the standard of review governing this motion.

### A. Standard Of Review

■ The case law governing motions for judgment of acquittal pursuant to *Fed. R.Crim.P.* 29 is well-settled and imposes a significant constraint on the district court's authority to overturn a jury's verdict. *See United States v. Scott,* 64 F.3d 377, 380 (8th Cir.1995) ("[t]he standard of review of an appeal concerning the sufficiency of the evidence is very strict, and the verdict of the

jury should not be overturned lightly") (quoting *United States v. Burks*, 934 F.2d 148, 151 (8th Cir.1991)); *United States v. Hood*, 51 F.3d 128, 129 (8th Cir.1995) ("jury verdicts are not lightly overturned") (citing *Burks*, 934 F.2d at 151); *Burks*, 934 F.2d at 151. The jury's verdict must be upheld if a reasonably minded jury could conclude by some interpretation of the evidence a defendant's guilt beyond a reasonable doubt. *Scott*, 64 F.3d at 380 (quoting *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir.), *cert. denied*, 505 U.S. 1211, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992)); *Hood*, 51 F.3d at 129; *United States v. Wilcox*, 50 F.3d 600, 602 (8th Cir.1995); *United States v. Smith*, 49 F.3d 475, 479 (8th Cir.1995); *United States v. McMurray*, 34 F.3d 1405, 1412 (8th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); *United States v. Parker*, 32 F.3d 395, 399 (8th Cir.1994); *United States v. Garfinkel*, 29 F.3d 1253, 1257 (8th Cir.1994); *United States v. Johnson*, 12 F.3d 827, 831 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 1860, 128 L.Ed.2d 482 (1994).

■ In reviewing a motion for judgment of acquittal based on the sufficiency of the evidence, the district court must "view the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences." *United States v. Kinshaw*, 71 F.3d 268, 271 (8th Cir.1995) (citing *United States v. Nunn*, 940 F.2d 1128, 1131 (8th Cir.1991)); *see also Scott*, 64 F.3d at 380 (the court must view the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor and accepting all reasonable inferences drawn from the evidence that support the jury's verdict) (quoting *Erdman*, 953 F.2d at 389); *United States v. Wells*, 63 F.3d 745, 752 (8th Cir.1995), *petition for cert. filed* (Jan. 31, 1996) (No. 95–1228); *United States v. Ireland*, 62 F.3d 227, 230 (8th Cir.1995); *United States v. Johnson*, 56 F.3d 947, 956 (8th Cir.1995); *Hood*, 51 F.3d at 129; *Wilcox*, 50 F.3d at 602; *Smith*, 49 F.3d at 478–79; *United States v. McGuire*, 45 F.3d 1177, 1186 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2558, 132 L.Ed.2d 811 (1995); *United States v. Whitfield*, 31 F.3d 747, 748 (8th Cir.1994); *United States v. Mitchell*, 31 F.3d 628, 632 (8th Cir.1994); *Garfinkel*, 29 F.3d at 1257; *United States v. Ojeda*, 23 F.3d 1473, 1475 (8th Cir.1994); *United States v. Deitz*, 991 F.2d 443, 446 (8th Cir.1993); *United States v. Segal*, 867 F.2d 1173, 1178 (8th Cir.1989); *United States v. Roberts*, 848 F.2d 906, 908 (8th Cir.), *cert. denied*, 488 U.S. 931, 109 S.Ct. 322, 102 L.Ed.2d 340 (1988); *United States v. Springer*, 831 F.2d 781, 783–84 (8th Cir.1987), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 277 (1988); *United States v. Hammond*, 821 F.2d 473, 477 (8th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 502, 98 L.Ed.2d 501 (1987); *United States v. Rodriguez*, 812 F.2d 414, 416 (8th Cir.1987). The court can overturn a jury's verdict only if "a reasonable factfinder must have entertained a reasonable doubt about the government's proof" of one of the essential elements of the crime charged. *Kinshaw*, 71 F.3d at 271 (citing *Nunn*, 940 F.2d at 1131); *see also Wells*, 63 F.3d at 752; *Johnson*, 56 F.3d at 956; *Ojeda*, 23 F.3d at 1475; *Deitz*, 991 F.2d at 446.

■ In addition, a conviction may be based on circumstantial and/or direct evidence, and the evidence "need not exclude every reasonable hypothesis except guilt." *Scott*, 64 F.3d at 380; *Wilcox*, 50 F.3d at 602–03 ("because circumstantial evidence is intrinsically as probative as direct evidence, the same standard applies even where a conviction rests entirely on circumstantial evidence") (quoting *Durns v. United States*, 562 F.2d 542, 546 (8th Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977)); *Segal*, 867 F.2d at 1178 (essential elements of a charge may be proved by circumstantial as well as direct evidence). If the evidence reasonably supports two contrary theories, the court must not disturb the jury's determination. *See Scott*, 64 F.3d at 380 (quoting *Burks*, 934 F.2d at 151). The court can neither weigh the evidence nor assess the credibility of the witnesses; these tasks belong exclusively to the jury. *Wells*, 63 F.3d at 752; *see also Ireland*, 62 F.3d at 230 (it is the jury's job to judge the credibility of witnesses and to resolve contradictions in the evidence) (citing *United States v. Agofsky*, 20 F.3d 866, 869 (8th Cir.), *cert. denied*, ——

U.S. ——, 115 S.Ct. 280, 130 L.Ed.2d 196 (1994)).

In addition to determining the appropriate standard of review for Schultz's renewed motion for judgment of acquittal, the court must also consider whether it is appropriate under *Fed.R.Crim.P.* 29(b) to consider the sufficiency of evidence as presented at the close of the government's case or as presented at the close of all the evidence. Here, Schultz moved for judgment of acquittal both at the close of the government's case and at the close of all the evidence, and the court reserved ruling on Schultz's motions at both times pursuant to *Fed.R.Crim.P.* 29(b). Thus, it is necessary to examine *Rule* 29(b) to determine the vantage point from which the court must apply the standard of review to Schultz's motions.

### B. Reservation Of Rulings Pursuant To Fed.R.Crim.P. 29(b)

Schultz asserts that because he moved for judgment of acquittal at the close of the government's case, and the court reserved its ruling on his motion, the court should only consider the evidence presented by the government before the conclusion of its case— that is, the evidence introduced before Schultz's initial motion pursuant to *Fed. R.Crim.P.* 29—in ruling on Schultz's motion. Thus, Schultz argues that the court cannot consider any evidence presented through Schultz's testimony in reviewing the jury's verdict in this case. The government concedes the explicit language of *Rule* 29(b) allows the court to reserve its ruling on a motion for judgment of acquittal and requires that the court limit its review to the evidence in the record at the time it reserved its ruling, which, in this case, was at the conclusion of the government's case. The government, however, accuses Schultz of seeking to "have his cake and eat it too" by taking advantage of the provisions of *Rule* 29(b) which restrict the review of the evidence and then criticizing the jury's ultimate decision based upon all the evidence. (Government's Memorandum, p. 5.). The government asserts that this application of *Rule* 29(b) is "unsupported by logic and contrary

to fundamental principles of fairness." (Government's Memorandum, p. 5.).

Federal Rule of Criminal Procedure 29(b), as amended in 1994, provides as follows:

> The court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. *If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.*

*Fed.R.Crim.P.* 29(b) (emphasis added). In addition, the Notes of the Advisory Committee on Rules discuss the 1994 amendment and its effect on *Rule* 29(b). In fact, the Advisory Committee specifically discussed the dilemma raised by the parties in this case, noting that

> [r]eserving a ruling on a motion made at the end of the government's case does pose problems, however, where the defense decides to present evidence and run the risk that such evidence will support the government's case. To address that problem, the amendment provides that the trial court is to consider only the evidence submitted at the time of the motion in making its ruling, whenever made.

*See* Notes of the Advisory Committee on Rules, 1994 Amendment.

Although the government is correct in contending that very little case law has been generated since the date of the 1994 amendment to *Rule* 29(b) to instruct courts in the practical application of this provision, the court finds the plain language of the Rule and the Notes accompanying the Rule specifically contemplate precisely the situation in this case, where the court reserved its ruling on Schultz's motion at the conclusion of the government's case, and Schultz decided to present evidence in his defense. The 1994 amendment was clearly designed to protect defendants such as Schultz who seek to challenge the sufficiency of the evidence presented by the government, yet at the same time, in the event the court reserves its ruling on

motion for judgment of acquittal, wish to launch a valiant defense through the presentation of their own evidence. Thus, the court is not persuaded to adopt the government's view that *Rule* 29(b), as amended, is unfair in its application and will accordingly limit its review of the jury's verdict in this case to the evidence in the record at the conclusion of the government's case. Having determined the standard of review, along with the scope of review, the court turns to the consideration of Schultz's motion and the issues raised therein.

### C. Schultz's Conviction Of Count One

The jury found Schultz guilty of Count One of the indictment, which charged him with violating 18 U.S.C. § 1955. In order to convict Schultz of violating this statute, the government had to prove the following elements at trial:

(1) That the defendant knowingly conducted, financed, managed, supervised, directed, or owned all of or part of a gambling business;

(2) That such gambling business was a violation of the laws of the state of Iowa;

(3) That five or more persons were involved in the operation of the business;

(4) That such gambling business was in substantially continuous operation for a period of more than thirty days or had a gross revenue of $2,000 or more in any one day.

Final Instruction No. 18. *See also* 18 U.S.C. § 1955; Manual of Model Criminal Jury Instructions, Eighth Circuit, § 6.18.1955 (1994). Schultz conceded at trial that he had been a bookie in Fort Dodge, Iowa between 1991 and 1993. Schultz, however, argues, as he did throughout the trial, that the jurisdictional five persons were not involved in his gambling operation to bring him within the scope of 18 U.S.C. § 1955. Thus, because Schultz contends that five or more persons were not involved in his business, the jury's finding of guilt of Count One must be overturned. Before evaluating the merit of Schultz's contentions, it is helpful to look at the history and background of the statute underlying Schultz's conviction of Count One of the indictment.

### 1. History and background of 18 U.S.C. § 1955

Congress enacted Section 1955 of Title 18 as part of the Organized Crime Control Act of 1970. *See* Organized Crime Control Act of 1970, 84 Stat. 922 (codified in various sections of Title 18 of the United States Code). In particular, Title VIII of this Act was aimed at "syndicated gambling which Congress found to have a pervasive effect upon interstate commerce." *United States v. Thomas*, 508 F.2d 1200, 1204 (8th Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975) (citing 1970 U.S.C.C.A.N. at 4028). Although Congress could have prohibited all illegal gambling, it apparently intended in its use of the word "business" to target an operation involving at least five or more persons similar to a firm engaged in any other field of commerce, known as the "jurisdictional five-person requirement." *See Thomas*, 508 F.2d at 1204 (citing the House and Senate Judiciary Committees' Reports on this portion of the Crime Control Act, both of which emphasize the focus of 18 U.S.C. § 1955 is to target business-type gambling operations so continuous and substantial as to be of national concern).

In requiring a minimum of five persons to constitute a gambling business in violation of 18 U.S.C. § 1955, Congress obviously intended some gambling businesses to remain beyond the scope of the statute. *Thomas*, 508 F.2d at 1205; *see also United States v. Brick*, 502 F.2d 219, 224 (8th Cir.1974) (in enacting 18 U.S.C. § 1955, Congress sought to differentiate between illicit gambling businesses of major proportions and those whose operations are relatively small). Specifically, Congress sought to avoid the assertion of federal power against "Mom and Pop" bookmaking businesses having, for example, two owners and three customers. *Thomas*, 508 F.2d at 1205 (citing House Hearings, at 325–26). Thus, Congress drafted the final language of 18 U.S.C. § 1955 with the intent to exclude mere bettors or customers from the count of "five or more." *Thomas*, 508 F.2d at 1205 (citing 1970 U.S.C.C.A.N. at 4029); *United States v. Follin*, 979 F.2d 369, 372 (5th Cir. 1992) (the scope of 18 U.S.C. § 1955, howev-

er, is broad in that it "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor") (quoting *Sanabria v. United States,* 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978)), *cert. denied,* 509 U.S. 908, 113 S.Ct. 3004, 125 L.Ed.2d 696 (1993).

### 2. Inclusion in the jurisdictional five

Because Congress excluded only mere bettors or customers from the jurisdictional five-person requirement, courts were confronted with the task of determining how substantial a person's role must be for him or her to be included as a member of the five persons under 18 U.S.C. § 1955. Subsequently, courts have found that the clear intent of Congress was to include all those who "participate in the operation of a gambling business, regardless how minor their roles." *United States v. Heacock,* 31 F.3d 249, 252 (5th Cir.1994) (only regular bettors are excluded from the count toward the jurisdictional five-person requirement); *Follin,* 979 F.2d at 372 (citing *United States v. Tucker,* 638 F.2d 1292, 1296 (5th Cir.), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981)); *see also United States v. Rieger,* 942 F.2d 230, 234 (3d Cir.1991); *Hammond,* 821 F.2d at 476 (all levels or personnel involved in the operation of the gambling business, not just those on management level, are considered in determining the jurisdictional five); *United States v. Reeder,* 614 F.2d 1179, 1182 (8th Cir.1980) (same); *United States v. Bennett,* 563 F.2d 879, 881 (8th Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977) (section 1955 includes

anyone who participates in a gambling business, other than a customer or a bettor); *United States v. Calaway,* 524 F.2d 609, 616 (9th Cir.1975) (Congress clearly meant to count all persons employed in the gambling business, not just those acting in a supervisory capacity), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976); *United States v. Bridges,* 493 F.2d at 921 (almost anyone who works in the gambling business counts toward making up the jurisdictional five); *United States v. Meese,* 479 F.2d 41, 43 (8th Cir.1973) (same).

Among those individuals considered as participants in a gambling business are bookmakers because bookmaking,[3] if accomplished on more than an occasional basis, is considered a gambling business under 18 U.S.C. § 1955. *United States v. Murray,* 928 F.2d 1242, 1247 (1st Cir.1991) (bookmaker who answered the phone and took money from customers was a participant in gambling business). In addition, where bookmakers exchange line information [4] and make lay off bets [5] with one another, such conduct is indicative of interdependent operations merging to form one illegal gambling business in violation of 18 U.S.C. § 1955. *Id.* (citing *United States v. DiMuro,* 540 F.2d 503, 508 (1st Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), and *United States v. Sacco,* 491 F.2d 995, 1002–03 (9th Cir.1974)); *see also Heacock,* 31 F.3d at 252 n. 3 (court found that the regular direct exchange of line information can connect otherwise independent gambling operations and counted line services as part of the jurisdic-

---

**3.** Bookmaking is known as the practice of taking bets on events that are commonly the focus of gambling. *United States v. Murray,* 928 F.2d 1242, 1247 (1st Cir.1991).

**4.** The Eighth Circuit has defined line information as follows:

[line information is] the 'odds' or 'handicaps' or 'point spreads' on the wagered contests. This information is usually provided in a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that team must win by a score exceeding the point spread given to the nonfavored team. The 'line' is subject to change as a given event approaches and a bookmaker may alter the 'line' on a particular event in order to try and even out the money wagered on each side.

*United States v. Parrino,* 816 F.2d 414, 415 n. 3 (8th Cir.1987) (citing *Thomas,* 508 F.2d at 1202 n. 2.)

**5.** In describing "lay off" betting, the Eighth Circuit has indicated this occurs when one bookmaker

passes on to another bookmaker the amount of bets by which his own 'book' is unbalanced; thus to the extent he loses to his own customers, he wins back from the other bookmaker, or vice versa. The "lay off" bet is therefore, in effect, bookmaker's insurance or reinsurance. Bookmakers, however, can and commonly do place personal wagers with one another which are not "lay off" bets.

*Parrino,* 816 F.2d at 415 n. 4 (citing *Thomas,* 508 F.2d at 1202 n. 2).

tional five persons) (citing *Boyd,* 566 F.2d at 935); *United States v. Aucoin,* 964 F.2d 1492, 1500 (5th Cir.) (one who exchanged line information and took lay off bets was counted among the jurisdictional five), *cert. denied,* 506 U.S. 1023, 113 S.Ct. 661, 121 L.Ed.2d 587 (1992); *United States v. Pinelli,* 890 F.2d 1461, 1466 (10th Cir.1989) (gambling business linked through the exchange of line information and lay off wagering), *cert. denied,* 495 U.S. 960, 110 S.Ct. 2568, 109 L.Ed.2d 750 (1990); *United States v. Jones,* 712 F.2d 115, 119–20 (5th Cir.1983) (even in the absence of a consistent pattern of lay off betting, the exchange of line information is sufficient to support inclusion in the jurisdictional five persons); *United States v. Southard,* 700 F.2d 1, 20 (1st Cir.) (those who exchange line information can be included in the jurisdictional five), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Thomas,* 508 F.2d at 1205 (a system of lay off betting constitutes the cement which can weld widely scattered operations into an effective gambling organization); *United States v. Bohn,* 508 F.2d 1145, 1149 (8th Cir.), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100 (1975); *United States v. Vigi,* 363 F.Supp. 314, 321 (E.D.Mich.1973) (each member of the jurisdictional five, including manager, line source, phone operator, or branch bookmaker, had a common goal—to exchange line information; each person's role was designed to further this common gambling activity).

The final jury instructions reflected the history and background of 18 U.S.C. § 1955 and addressed the factors the jury should consider in determining whether the government met its burden of showing the five or more persons were participating in the gambling business in violation of § 1955. In Final Jury Instruction No. 18, the court instructed the jury, in part, as follows:

> [i]n proving that five or more persons were involved in the operation of the business, it is not necessary to prove that anyone other than defendant has been charged with an offense or that the same five people, including the defendant, owned, financed, or conducted such gambling business throughout more than a thirty-day period, or even that the defendant knew the names or identities of any given number of

people who might have been so involved. A defendant need not know that the activity engaged in was composed of five or more participants, but must only "conduct, finance, manage, supervise, direct, or own all or part of" the gambling business to be guilty of this offense where the gambling business meets the second, third, and fourth elements of the offense.

A mere bettor or customer of a gambling business is not involved in the operation of the business, and therefore cannot be counted as one of the five or more persons necessary to prove this element of the offense. However, if you find beyond a reasonable doubt that a defendant is a bookmaker and that he regularly exchanges line information, or regularly places or accepts layoff bets with another bookmaker, you may consider that as evidence that the defendant and the other bookmaker are members of the same gambling business. In determining whether people are linked for the purpose of determining whether they are members of the same illegal gambling business, you must look at the evidence as a whole. The relationship between the bookmakers must be closely analyzed to determine whether they are truly independent or whether their relationships serve to weld them into a single gambling business.

Final Jury Instruction No. 18. Thus, the court indicated the necessity of an analysis of the relationship between the jurisdictional five persons to determine whether each member's participation reached a level warranting his or her inclusion in the jurisdictional five under 18 U.S.C. § 1955.

### 3. *The thirty-day alternative*

 Pursuant to 18 U.S.C. § 1955, the government must also prove that such gambling business was in substantially continuous operation for a period of more than thirty days or had a gross revenue of $2,000 or more in any one day. Regarding the "thirty-day alternative" in 18 U.S.C. § 1955, the government need not prove that the same five persons participated for thirty days. *Murray,* 928 F.2d at 1246. *See also United States v. Tucker,* 638 F.2d 1292,

1297–98 (5th Cir.), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981). Furthermore, the government is not required to show that the five participants were active every day throughout the thirty-day period. *Murray,* 928 F.2d at 1246. Section 1955 merely requires substantially continuous, as opposed to a daily, operation. *See id.; see also United States v. Allen,* 588 F.2d 1100, 1102–04 (5th Cir.) (eleven days of surveillance over a five month period sufficient for inference of substantially continuous operation), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. Nerone,* 563 F.2d 836, 843–44 (7th Cir. 1977) (weekend casino operation sufficient to show substantial continuity of operation), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978).

There is a split in the circuits, however, regarding whether the jurisdictional five-person requirement and the thirty-day requirement under 18 U.S.C. § 1955 are to be read separately or together. Some circuits have construed the five-person requirement separate from the thirty-day requirement, and consequently, have found that the government did not have to prove that five or more persons at all times continued the gambling operation for a period in excess of thirty days. *See, e.g. United States v. Grey,* 56 F.3d 1219, 1222 (10th Cir.1995) (citing *United States v. Smaldone,* 485 F.2d 1333, 1351 (10th Cir.1973), *cert. dismissed,* 416 U.S. 917, 94 S.Ct. 1625, 40 L.Ed.2d 119, *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974)); *Rieger,* 942 F.2d at 234–35 (the five-person requirement and the thirty-day requirement are "two separate and independent jurisdictional requirements for an illegal gambling business"); *United States v. Smaldone,* 485 F.2d 1333, 1351 (10th Cir.1973) ("[i]t is not essential ... to establish that each conductor was involved in the gambling business for more than thirty days or generated at least $2,000 gross revenue in a single

day. These requirements refer to the gambling operation and not to individuals."), *cert. dismissed,* 416 U.S. 917, 94 S.Ct. 1625, 40 L.Ed.2d 119, *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). The First and Ninth Circuits read the five-person requirement and the thirty-day requirement together, interpreting § 1955 as requiring the involvement of at least five persons in the gambling business for a minimum of thirty days. *Murray,* 928 F.2d at 1246–47 ("[a]lthough the government need not prove that each of the eleven persons alleged to be involved were participants, it must prove the participation of five persons for a minimum of thirty days."); *see also United States v. Gilley,* 836 F.2d 1206, 1212 (9th Cir.1988) (the court concluded that the district judge should have given a unanimity instruction "on the conjunction of the" persons and days elements, and his failure to do so was "plain error" requiring reversal of the substantive charge of conducting an illegal gambling business in violation of § 1955).

Although the Eighth Circuit has not decided whether these requirements should be read separately or together,[6] this court found the logic of the First and Ninth Circuits persuasive. The plain language of 18 U.S.C. § 1955 established *three* elements as defining an "illegal gambling business"—namely, the requirement that the business violates state law, the five-person requirement, and the thirty-day or $2,000 in a day requirement, and connects the five-person requirement and the thirty-day requirement with "and," indicating that both requirements must be met to establish an "illegal gambling business" under § 1955. Therefore, the court instructed the jury that if they were to find that the gambling operation was in substantially continuous operation for a period of more than thirty days, they must find that "the gambling business involved the participation of five or more persons for more than

---

**6.** While the Eighth Circuit did not tie these two requirements together in discussing the factors to be weighed in determining whether 18 U.S.C. § 1955 is applicable, the court in *United States v. Trupiano* did note that "Trupiano and the other key participants in the operation were involved almost on a daily basis in activities related to the functioning of the corporation." *United States v.*

*Trupiano,* 11 F.3d 769, 772–74 (8th Cir.1993). Thus, the court did consider whether several of the key participants were involved in the gambling operation for at least more than one day in making its determination whether this gambling operation came within the scope of 18 U.S.C. § 1955.

thirty days, whether or not each of the five or more persons participated every day, in order to convict any defendant of conducting an illegal gambling business." *See* Final Jury Instruction No. 18. In accordance with this instruction, the jury found that Russ Kramer, Harry Hull, Paul Clergy, Gary Fall, George Schultz, and Tim Sapp participated in an illegal gambling business from November 1, 1993, to December 8, 1993.

### 4. The $2,000.00 in a day requirement

■ Under 18 U.S.C. § 1955, if the government does not prove that five or more persons conducted a gambling operation for more than thirty days, then it must prove that five or more persons conducted a gambling operation which had a gross revenue of $2,000.00 in any single day. *See* 18 U.S.C. § 1955. In this context, gross revenue refers to the total amount wagered in any one day. *Murray*, 928 F.2d at 1250; *see also United States v. Reitano*, 862 F.2d 982, 986 (2d Cir.1988).

Likewise, the court set forth this alternative to the thirty-day requirement,[7] instructing the jury that

> [they] must find that the gambling business involved the participation of five or more persons on the day in which the gambling business had gross revenues of $2,000 or more, whether or not each of the five or more persons actually participated that day, in order to convict any defendant of conducting an illegal gambling business under this alternative.

Final Instruction No. 18. In addition to answering the interrogatory addressing the thirty-day requirement, the jury also answered this alternative, finding that Kramer, Hull, Clergy, Fall, Schultz, and Sapp participated in an illegal gambling business which had gross revenues of $2,000 or more on November 28, 1993.

7. As with the thirty-day requirement and for the same reasons, the court found that the "$2,000.00 in one day requirement" should be read together with the five-person requirement and instructed the jury in accordance with this interpretation.

8. In the defense's case-in-chief, Schultz revealed that account designation number "596" was the

### 5. Schultz's claims regarding the jurisdictional five

Schultz maintains that no reasonable jury could have concluded at the end of the government's case that Schultz was guilty of both counts of the indictment. Specifically, Schultz asserts that no reasonable jury could have found (1) that these five people (other than Schultz) were a part of Schultz's gambling operation; (2) that these five people were a part of Schultz's gambling operation during the thirty-eight day period designated by the jury; or (3) that these five people were a part of Schultz's gambling operation on November 28, 1993. The court examines Schultz's contentions to determine whether the jury's verdict should be overturned.

#### a. Paul Clergy, Gary Fall, and Tim Sapp

***i. Identification by account designation.*** Schultz argues that at the conclusion of the government's case, no jury member had heard the names of Paul Clergy, Gary Fall, or Tim Sapp. Agent Stirling, an FBI agent testifying on behalf of the government, identified the following account designations as most frequently appearing in the betting records of Schultz: "079," "187," and "596."[8] Stirling also noted that "Ci" was seen in Schultz's records, but much less frequently. Schultz maintains that the names of Clergy, Fall, and Sapp were provided only through the cross-examination of Schultz, after the government had presented its evidence and rested its case. Thus, at the close of the government's case, Clergy, Fall, and Sapp were only identified by their account designations in Schultz's records. Because the court should only consider the evidence presented at the close of the government's case for purposes of determining Schultz's *Rule 29(b)* motion, Schultz argues that the account designations offered by the government are

number he used to represent Russ Kramer in his records. Because Schultz has addressed Kramer separately in his brief in support of his motion, the court will likewise discuss the evidence linking Kramer to the gambling operation and his inclusion in the jurisdictional five separately in Section II(C)(5)(c) of this Order.

not sufficient to identify or include Clergy, Fall, and Sapp within the jurisdictional five persons under 18 U.S.C. § 1955.

The government contends these numbers or account designations sufficiently identified the other members of Schultz's gambling business. Although Schultz did identify these members by name, specifically, Clergy as "079," Fall as "187," and Sapp as "CiA" or "Ci," the government asserts the jury could reasonably identify these members of the gambling operation by their account designations as presented in the government's case-in-chief. The government argues that these account designations reveal persons who served as line sources, whose line information appeared throughout Schultz's records and in wagering records, and a reasonable jury could have determined that Schultz was in regular contact with four distinct individuals (including "596," a.k.a. Russ Kramer), exchanging information with those line sources identified by shorthand account designation.

Both parties cite *United States v. Trupiano*, 11 F.3d 769, 772 (8th Cir.1993), in which the Eighth Circuit held that unindicted and unnamed persons may be included in the jurisdictional five-person requirement of 18 U.S.C. § 1955. *Id.* at 772 (citing *Reeder*, 614 F.2d at 1182). The Eighth Circuit also found that section 1955 requires "only that the involved person 'conduct' the business, which allows a person to be counted who contributes to the gambling operation without having any control over it." *Trupiano*, 11 F.3d at 773; *Reeder*, 614 F.2d at 1182; *Bennett*, 563 F.2d at 882. Schultz asserts that although unindicted and unnamed persons may be included in the jurisdictional five, the case law interpreting the jurisdictional five-person requirement either identifies the members of the illegal gambling business by name or by their roles in the gambling operation; thus, the government's identification of these persons by their account designations is insufficient proof of their participation in an illegal gambling business under 18 U.S.C. § 1955.

■ Although in cases interpreting the jurisdictional five-person requirement, the government typically identifies the members of the illegal gambling business by name

or by their roles in the operation, the Eighth Circuit has nonetheless held that the government need not identify the members of an illegal gambling business as defined by 18 U.S.C. § 1955 by name. *Trupiano*, 11 F.3d at 772. The government need only prove that these five or more persons exist and play a role in conducting the gambling business. *Id.* at 772–73. Here, the government identified Clergy (079), Fall (187), and Sapp (Ci or CiA) by their account designations in Schultz's records and by their roles in the operation as consistent sources of line information for Schultz. *See e.g.* Ex. 8–40, 9–188 (079 and 187's lines written on sheet provided by fourth line source); Ex. 9–102 (Week 2 line sheet with line from sheet's source, Ci); Ex. 9–103 (Week sheet with line from Ci and 079); Ex. 9–105 (Week 4 sheet with line from source 079); Ex. 9–206 (Week 8 betting record with line from 079 and 187 on Wash./Buffalo game recorded across the top). In addition, the wagering records revealed that 079 provided lines for the November 22, 1993 Monday Night Football game. *See* Ex. 9–240. The jury could have reasonably inferred that based on the prevalence of these account designations in Schultz's records, Schultz was "in business" with three distinct individuals, with whom he exchanged line information and whom he identified by account designation.

■ Also, these three account designations appear in the wagering records, often in conjunction with wagers on teams on which Schultz had taken too much wagering action. *See e.g.*, Ex. 8–24 (on back of exhibit where Schultz charts Minnesota and Tampa Bay game, $1,000 subtracted off heavy side, Minnesota, $1,000 wager with 187 recorded below, wagers with Ci next to 079 designation); Ex. 8–8 (where Oklahoma/Nebraska game charted, $1,200 subtracted off Oklahoma side with 187 designation, reducing Schultz's liability on that game); Ex. 9–205 (wagers recorded in Week 8 records with 187, 596, 079, Ci); Ex. 9–212 (Week 8 wager with 187); Ex. 9–217 (Week 8 wager with 187 on Pitt, next to chart showing heavy wagering on Pitt). Also, Schultz's wagering records revealed that a lay off bet was made with 187 on a team on which Schultz had

taken heavy betting action. *See* Ex. 9–101. The jury could reasonably infer from these records that Clergy, Fall, and Sapp were distinct, yet interdependent bookmakers based on the wagers placed with these three line sources, just as the jury could have reasonably found that the records identifying those designations supported a finding that these three individuals were part of an illegal gambling business in violation of 18 U.S.C. § 1955.

*ii. Clergy, Fall, and Sapp as participants during the identified time period or on November 28, 1993.* Schultz argues that even if the government were permitted to include these account designations as individuals under 18 U.S.C. § 1955, no reasonable jury could conclude that 079, 187, and Ci or CiA were participants in the gambling business during the thirty-eight day time period identified by the jury. Schultz contends that 079 and 187 do not appear as regular line sources or as regular lay off sources during this time period and that Ci or CiA does not appear in the betting records at all during this time period other than as a mere bettor.

 The records found at Schultz's apartment, however, include line sheets generated by Schultz's outside sources for November 28, 1993, the date identified by the jury. *See* Ex. 8–30, 6–172. Viewing the evidence in the light most favorable to the government, these line sheets, when considered among the other line sheets generated by these sources, could indicate a pattern or continuing relationship and exchange of line information, typical of the existence of a gambling "business." *See Jones,* 712 F.2d at 119 (being a regular supplier of line information was sufficient to support inclusion in the jurisdictional five); *Southard,* 700 F.2d at 20 (one who exchanged line information but was not a "mere bettor" was included in the jurisdictional five). In addition, although Ci or CiA only appeared as a bettor during this time period, Ci/CiA appears elsewhere in the records for fall 1993 as a line source for Schultz. Again, complying with the standard of review and viewing the evidence in the light most favorable to the government, the jury could have reasonably concluded that Ci/CiA had a continuous relationship with

Schultz and participated as a line source for this gambling operation in violation of 18 U.S.C. § 1955.

Although there is not a tremendous amount of evidence supporting the government's theory that these account designations appeared regularly from November 1, 1993, to December 8, 1993, it is not within the court's authority to reweigh the evidence. *Wells,* 63 F.3d at 752; *see also Ireland,* 62 F.3d at 230 (it is the jury's job to judge the credibility of witnesses and to resolve contradictions in the evidence) (citing *Agofsky,* 20 F.3d at 869). The constrictive standard of review which the court must apply requires the court to view the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor and accepting all reasonable inferences drawn from the evidence that support the jury's verdict. *See Scott,* 64 F.3d at 380 (quoting *Erdman,* 953 F.2d at 389). Thus, considering the evidence in the records indicating the exchange of line information between Schultz and "079," "187," and "Ci" or "CiA," the court concludes that a reasonable jury could have inferred that Clergy, Fall, and Sapp were part of a gambling operation in existence from November 1, 1993 to December 8, 1993 or on November 28, 1993, when the business had gross revenue of $2,000 or more.

*iii. Lay off betting.* Schultz further argues that Agent Ray Stirling provided the only evidence in the record indicating that Schultz made lay off bets. Stirling opined that certain notations in Schultz's records demonstrated the existence of lay off bets. Schultz contends Stirling admitted that the bets that were allegedly indicative of lay off bets were small, and smaller bookmakers often make personal bets. Thus, Schultz argues these alleged lay off bets were likely personal bets, and as such, are not indicative of a larger gambling operation with interdependent bookmakers. Schultz argues Stirling also testified that the winnings from a lay off bet are used to pay off the bets of the book and that the successful collection of the book's bets was important in making the lay off system work. Here, Schultz contends the jury heard testimony that Schultz did not

collect his debts regularly or assertively. Thus, Schultz argues that no reasonable jury could find that he was making lay off bets or that he was involved in an interdependent bookmaking operation.

While the court does not find much evidence in the record to support the government's theory that Schultz made lay off bets, the jury nonetheless heard testimony and viewed documentary evidence supporting this conclusion. Agent Stirling testified that there were several notations in Schultz's records indicative of lay off bets. *See e.g.,* Ex. 9–101. Furthermore, Bill Pischke, one of Schultz's customers and a government informant, testified Schultz told him that he "owed half of the money to Des Moines."

Schultz maintains that Pischke's testimony was uncorroborated and that despite Stirling's ultimate opinions, other theories explain the existence of apparent lay off bets in Schultz's records. I agree. If I had been the trier of fact, I would not have found that Schultz engaged in lay off betting. The primary source of any evidence indicating Schultz engaged in lay off betting was Agent Stirling, and I did not find his testimony credible. Furthermore, even if Stirling's testimony was credible, Schultz had reasonable explanations for the appearance of alleged lay off bets in his records. However, in regards to weighing the evidence and determining the credibility of witnesses, I must defer to the jury's findings. *See Wells,* 63 F.3d at 752; *Ireland,* 62 F.3d at 230 (it is the jury's job to judge the credibility of witnesses and to resolve contradictions in the evidence) (citing *Agofsky,* 20 F.3d at 869). Thus, in viewing the evidence in a light most favorable to the government, the jury could have reasonably found that Pischke's testimony, together with Agent Stirling's testimony about Schultz's wagering records, supported a finding that Schultz made lay off bets to other bookmakers within his operation.

**iv.** *Exchanging line information.* Schultz also asserts Agent Stirling's conclusion that Schultz was exchanging line information with these other alleged bookmakers was unfounded. Schultz maintains that Stirling did not offer the jury any explanations as to why or how Schultz allegedly adjusted his line in response to the line information he noted in his records. Furthermore, Schultz contends Stirling had no information identifying 079, 187, or CiA as bookmakers; thus, no reasonable jury could determine that these numbers represented people, entities, or even Las Vegas casino lines. Schultz also argues the government offered no evidence regarding when Schultz received these line sheets in a given week.

Again, although there is not an inordinate amount of evidence supporting Schultz's adjustment of his line in response to the line information he noted in his records, his records did reflect changes to the line provided by the different sources, where, for example, a slash was drawn through a number and a different number was written in its place. Additionally, line information from these account designations appeared throughout the presentation of the documentary evidence in the government's case. *See, e.g.,* Ex. 9–102 (Week 2); Ex. 9–103 (Week 3); Ex. 9–105 (Week 4); Ex. 9–206 (Week 8). Also, on December 9, 1993, the date the search warrants were executed in this case, Schultz already had in his possession line sheets from his sources for the following weekend; thus, the jury could have found Schultz did use the line sheets provided by Clergy, Fall, and Sapp to set his line because he did, in fact, have the line sheets in time to make adjustments. *See* Ex. 6–28, 6–29. Taken in the light most favorable to the government, the jury could have reasonably concluded Schultz was, in fact, exchanging line information with Clergy (079), Fall (187), and Sapp (Ci or CiA).

The jury in this case heard testimony about the importance of bookmakers' exchange of line information. In *United States v. Schaefer,* the Eighth Circuit noted that communication and cooperation among those who operate a gambling business minimizes the financial risks associated with gambling and makes gambling profitable for all involved in the operation. *See Boyd,* 566 F.2d at 933–34 (citing *United States v. Schaefer,* 510 F.2d 1307, 1312 (8th Cir.), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1975, 44 L.Ed.2d 466 (1975)). In addition, courts have noted it is

essential that bookmakers utilize "lines" which are consistent to prevent sophisticated bettors from placing bets with two bookmakers, on opposite sides, in effect, pitting the bookmakers against each other. *See Boyd,* 566 F.2d at 933–34; *Bohn,* 508 F.2d at 1149 (the interdependence of the various individual components, including the sharing of line information and the exchanging of profits through lay off betting, indicates that there was one illegal gambling business under 18 U.S.C. § 1955) (citing *Schaefer,* 510 F.2d at 1312). Here, viewing the evidence in a light most favorable to the government, the jury could have reasonably concluded Schultz communicated in this manner with Clergy, Fall, and Sapp, forming a "loose affiliation which, through continuous communication, conducted this gambling operation" in violation of 18 U.S.C. § 1955. *See Schaefer,* 510 F.2d at 1312.

### b. Harry Hull as one of the jurisdictional five persons

■ *i. Inclusion of Hull.* Schultz argues that no reasonable jury could have included Harry Hull in the jurisdictional five persons under 18 U.S.C. § 1955. Schultz maintains that Hull did not testify, and the government did not introduce any records belonging to Hull. Rather, the only evidence about Hull's participation in this gambling operation was presented through a tape recording of Harry Hull and George G, a government informant in December 1992 and two conversations in January 1993; the testimony of George G, who placed bets with Hull in December 1992 and January 1993; and testimony that Hull worked at the building where Schultz lived from October 1993 through December 8, 1993. Schultz asserts that none of this evidence is sufficient to support a finding that Hull was a participant in a six-person gambling operation between November 1, 1993, and December 8, 1993.

Although the evidence establishes that Hull's participation as an active bookmaker waned in late 1993, the evidence does show that during the 1992–93 sports season, Hull took bets from George G and paid winnings to him. On tape, Hull also collected money on Schultz's behalf from George G, introduced Schultz to George G and referred his basketball business to Schultz since Hull "didn't do basketball," and told George G that Hull and Schultz worked together, with Hull handling football and Schultz taking wagers on basketball as well. Also, on tape, Hull told George G that he sometimes took basketball wagers for Schultz and sometimes answered the phone when Schultz was out of town. Hull also provided additional information about Schultz's operation, advising that Russ Kramer would answer the basketball line for Schultz while Schultz was on vacation. In addition, Hull paid Cary Sturtz, a customer of Schultz, winnings that Schultz owed Sturtz. While Schultz maintains that the government produced no evidence to show that any alleged participation by Hull occurred from November 1, 1993, to December 8, 1993, the evidence reflects that Schultz moved into the upstairs apartment of Hull's building in the fall of 1993 and operated his business from that location. Hull also resided at this location during the week. Therefore, Hull provided assistance to Schultz's operation from November 1, 1993, to December 8, 1993, by providing a place to operate this gambling business. Considering Hull's involvement with Schultz's business and knowledge of it, coupled with providing a location for the business, and viewing this evidence in the light most favorable to the government's evidence, the jury reasonably could have found this degree of participation by Hull sufficient to justify his inclusion in the jurisdictional five persons under 18 U.S.C. § 1955. *See Trupiano,* 11 F.3d at 773 (court found that individual who was the owner of the car dealership where the games were played and participated in the games could be counted toward the jurisdictional five under 18 U.S.C. § 1955; court also found that individual who recruited customers and was compensated for his work was a participant under section 1955).

*ii. Admissibility of Hull's statements.* For purposes of presenting the case to the jury, the court found that the government had proven by a preponderance of the evidence that Schultz and Hull were co-conspirators. As such, the statements of both Schultz and Hull were admissible in the case

against Schultz. *See United States v. Bell,* 573 F.2d 1040 (8th Cir.1978). Schultz argues the court should not have admitted Hull's recorded statements in exhibits 1, 2, and 3 as co-conspirator hearsay admissible under Federal Rule of Evidence 801(d)(2)(E).

▮ Pursuant to Federal Rule of Evidence 801(d)(2)(E), an out of court statement made "by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay and may be admitted in evidence. In order for a co-conspirator's statement to be admitted, the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were parties to the conspiracy; and (3) the declaration was made during the course of and in furtherance of the conspiracy. *United States v. Carr,* 67 F.3d 171, 174 (8th Cir.1995); *Mitchell,* 31 F.3d at 631; *United States v. Roach,* 28 F.3d 729 (8th Cir.1994); *United States v. Ortiz–Martinez,* 1 F.3d 662 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 355, 126 L.Ed.2d 319 (1993); *United States v. Edwards,* 994 F.2d 417 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 701, 126 L.Ed.2d 667 (1994); *United States v. Alonzo,* 991 F.2d 1422 (8th Cir.1993). Furthermore, in making the preliminary factual determination under Rule 801(d)(2)(E), the district court is "not limited to independent evidence; it may examine the hearsay statements themselves in determining whether a conspiracy exists." *Roach,* 28 F.3d at 738 (citing *Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)). *But see United States v. Kelly,* 989 F.2d 980 (8th Cir.) (in supporting these co-conspirator statements, the government may provide circumstantial evidence, but must provide evidence independent of the challenged statements), *cert. denied,* —— U.S. ——, 114 S.Ct. 206, 126 L.Ed.2d 163 (1993). Thus, the court can consider the challenged statements themselves, along with independent corroborating evidence, to determine whether a conspiracy existed during the time charged in the indictment.

▮ Schultz claims there is insufficient corroborating evidence, aside from Hull's statements, to prove the existence of a conspiracy during the time charged in the indictment. However, George G testified that Hull accepted money from him to pay to Schultz, and Hull paid winnings to George G on Schultz's behalf. Also, Cary Sturtz testified that Hull paid him winnings owed by Schultz. Hull provided a location from which Schultz could run the gambling business. The records seized during the execution of the search warrants in this case revealed the exchange of line information and wagers. Also, the telephone records revealed hundreds of very short calls forwarded from Schultz's number to Kramer's number in the hours prior to the beginning of games, supporting Hull's statements that Kramer agreed to answer calls pertaining to the basketball games for Schultz.

Hull's statements to George G, contained in Exhibits 1, 2, and 3, were made in December 1992 and January 1993. In these statements, Hull conducts and discusses gambling business with George G, exchanges money on behalf of Schultz, refers basketball business to Schultz, and refers to Kramer, who would be answering the basketball line for Schultz while Schultz was out of town. In consideration of the statements themselves in which Hull actually referred business to Schultz, the testimony of George G and Cary Stultz, and the documentary evidence, the court finds by a preponderance of the evidence that Hull's statements were made during the course of and in furtherance of this conspiracy to conduct an illegal gambling business. Thus, Hull's statements were properly admitted under the authority of *United States v. Bell* and pursuant to Federal Rule of Evidence 801(d)(2)(E). *See Bell,* 573 F.2d at 1044.

#### c. *Russ Kramer as one of the jurisdictional five persons*

▮ Schultz argues that the government presented no evidence at trial that Kramer played any role at all in this alleged gambling business from November 1, 1993 to December 8, 1993. Specifically, Schultz asserts there are no phone calls placed during the identified time period to either of the phone numbers the government identified as belonging to Kramer. Schultz further contends

that none of Schultz's betting records identify a "Russ Kramer;" the records only indicate "596," whom Schultz identified on cross-examination as the account designation representing Russ Kramer.

The five-person requirement under 18 U.S.C. § 1955 does not require that the government name the participants of the illegal gambling business, but only that it prove the existence and roles of the participants. *See Trupiano,* 11 F.3d at 772. While Kramer's full name may have been referenced before the time period in question through statements by Hull and on a check made out to Russ Kramer in September 1992, which both Schultz and Kramer endorsed, *see* Ex. 30, Kramer's account designation appears throughout Schultz's betting and wagering records during the identified time period. *See, e.g.,* Exs. 8–40, 8–42 (line sheets from 596 for Week 14, December 4–6, 1993). Based upon the records during the identified time period, Hull's statements, the phone records, the check made out to Kramer, and viewing the evidence in the light most favorable to the government's evidence, the jury could have reasonably concluded that Kramer or "596's" relationship with Schultz was ongoing and continued through December 8, 1993, when the gambling operation was terminated.

### 6. Summary of evidence supporting Schultz's conviction of Count One

██ 18 U.S.C. § 1955 requires that five or more persons conduct an illegal gambling business in excess of a thirty-day time period or on one particular day when the gambling business had a gross revenue of $2,000 or more. *See* Final Instruction No. 18; 18 U.S.C. § 1955. In response to specific interrogatories, the jury in this case concluded that Paul Clergy, Gary Fall, Tim Sapp, George Schultz, Harry Hull, and Russ Kramer conducted an illegal gambling business from November 1, 1993 to December 8, 1993, and on November 28, 1993, when the business had a gross revenue of $2,000 or more. Here, the government identified Schultz by name and by his role in the business as the person who ran the operation. Likewise, the government identified Harry Hull in its case-in-chief by name and as the person who assisted Schultz in starting the gambling business, referring bettors to him, and ultimately providing him a place from which to operate. The government also presented evidence that Hull identified Kramer as Schultz's partner and evidence that Hull and other documentary evidence identified Kramer as someone who answered the telephone and took bets for Schultz. Lastly, the government identified Clergy, Fall, and Sapp by account designations in Schultz's records and by their roles as line sources and interdependent bookmakers in this gambling operation. The court does not find that the government had an overwhelming amount of evidence supporting its theory that these six persons conducted a gambling business in violation of 18 U.S.C. § 1955, and further opines that perhaps a different jury would have concluded otherwise. However, the role of the court is to determine whether this jury could have reasonably concluded by some interpretation of the evidence Schultz's guilt beyond a reasonable doubt. *See Scott,* 64 F.3d at 380 (quoting *Erdman,* 953 F.2d at 389); *Hood,* 51 F.3d at 129; *Wilcox,* 50 F.3d at 602. Here, viewing the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict, while it is not free from doubt, the court finds the jury could have reasonably concluded by some interpretation of the evidence that Schultz was guilty beyond a reasonable doubt of Count One of the indictment. Therefore, the court denies Schultz's motion for judgment of acquittal of Count One of the indictment. Having drawn this conclusion, the court turns to the consideration of Schultz's motion for judgment of acquittal of Count Four of the indictment.

### D. Schultz's Conviction Of Count Four

██ Schultz challenges his conviction of the conspiracy charge, Count Four of the indictment, which is dependent on his challenge to Count One of the indictment. Schultz alleges that because he believes the government failed to prove a violation of 18 U.S.C. § 1955, as set forth in Count One, there can be no conspiracy because no illegal

objective has been proven. Schultz further claims no reasonable jury could find that Schultz agreed with anyone to conduct or use a telephone to further a five-person gambling business as defined in 18 U.S.C. § 1955.

To convict Schultz of a violation of 18 U.S.C. § 371, as outlined in Count Four of the indictment, the government was required to prove that (1) on the dates provided in the indictment, Schultz and one or more persons reached an agreement or understanding to violate federal laws, here, 18 U.S.C. §§ 1955 and 1952; (2) Schultz voluntarily and intentionally joined in the agreement or understanding; (3) at the time Schultz joined in the agreement or understanding, he knew its purpose; and (4) while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly committed one of the listed overt acts in the indictment. *See* 18 U.S.C. § 371.

Here, Schultz asserts that because no reasonable jury could have found he violated 18 U.S.C. § 1955, he could not have agreed with anyone to violate the same statute in violation of 18 U.S.C. § 371. The court has determined, however, that the jury in this case could have reasonably concluded Schultz was guilty beyond a reasonable doubt of violating 18 U.S.C. § 1955. Thus, the court's upholding of the jury's verdict on Count One derails Schultz's argument that without a conviction of Count One, there can be no conviction of Count Four.

The court also finds that based on the evidence discussed in detail above, including the statements of Harry Hull, the testimony of George G, Cary Sturtz, and Agent Stirling, in particular, and the documentary evidence, a reasonable jury could have concluded (1) that Schultz agreed to violate 18 U.S.C. § 1955 by conducting an illegal gambling business in violation of the terms of the statute; (2) that Schultz voluntarily and intentionally joined in the agreement; (3) that Schultz knew the purpose of the gambling business at the time he joined the agreement; and (4) while the agreement to conduct this business was in effect, a party to the conspiracy knowingly committed one of the listed overt acts in the indictment. Thus, the court will not overturn the jury's verdict

of guilt beyond a reasonable doubt on Count Four of the indictment and denies Schultz's motion for judgment of acquittal of this count as well.

In addition to filing a renewed motion for judgment of acquittal, Schultz also filed two separate motions for new trial pursuant to Federal Rule of Criminal Procedure 33. Having denied Schultz's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, the court will now proceed to the disposition of these two motions pursuant to Rule 33.

## III. SCHULTZ'S MOTIONS FOR NEW TRIAL

In his first motion, Schultz asserts the court should grant Schultz a new trial because it improperly admitted the out of court statements of Harry Hull in the case against Schultz. Schultz argues in his second motion that a new trial is warranted because most of the documentary evidence introduced at trial was improperly admitted. Before discussing Schultz's specific arguments in support of his motions, the court will examine *Rule* 33 and the appropriate standard of review for these motions.

Federal Rule of Criminal Procedure provides as follows:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

*Fed.R.Crim.P.* 33. Thus, the court may grant Schultz's motions for new trial pursuant to *Rule* 33 only "if required in the inter-

est of justice." *See United States v. Van Kirk*, 935 F.2d 932, 934 (8th Cir.1991).

### A. Admission Of Hull's Statements

Schultz reasserts the arguments he made in his renewed motion for judgment of acquittal, discussed in this opinion in Section II(C)(5)(b)(ii). Specifically, Schultz argues that because the statements of Harry Hull were erroneously admitted, Schultz is entitled to a new trial. Schultz contends that these statements comprised the bulk of the evidence to support a crucial aspect of the government's case, the inclusion of Hull in the jurisdictional five under 18 U.S.C. § 1955. Thus, Schultz claims the interests of justice require Schultz to have a new trial due to the "erroneous" admission of these out of court statements.

As discussed above, the court does not find that Hull's out of court statements were erroneously admitted. Rather, under the authority of *United States v. Bell* and pursuant to the Federal Rule of Evidence 801(d)(2)(E), the court found the government proved by a preponderance of the evidence that Schultz and Hull were co-conspirators. As such, the statements of Hull were admissible in the case against Schultz. The court concedes that these statements were, in fact, a crucial element of the prosecution's case; nevertheless, the government met its burden of proving by a preponderance of the evidence that Schultz and Hull were co-conspirators and that Hull's statements were made during the course of and in furtherance of a conspiracy. *See* Section II(C)(5)(b)(ii) of this opinion. Thus, despite the significant and ultimately devastating effect of the admission of these statements, the court finds that the interests of justice do not require a new trial on this ground.

### B. Admission Of Documentary Evidence

In his second motion, Schultz contends that most of the documentary evidence the government introduced at trial was admitted into evidence without the proper foundation for admission. At trial, I did not allow the admission of any exhibits in the government's Series 14 on the basis that no government witness had properly testified to their foundation. I opined that the documents had merely been identified as being "consistent with" the types of documents seized at 1100½ Central. Although one witness did testify that all exhibits in Series 14 were seized from 1100½ Central, no witness testified that these particular documents came specifically from Box 14 and, therefore, from 1100½ Central. I concluded that such an identification was insufficient to lay the proper foundation, and the court excluded the exhibits in the government's Series 14.

Now, Schultz seeks a new trial because the government presented the documents in the government's Series 3, 6, 7, 8, 9, 10, and 13 in the same manner as it presented the documents in Series 14. Specifically, the government witness testified the documents found in these series were "consistent with" the types of records found at the respective location for each series. Schultz claims no government witness properly testified that these documents were, in fact, what they purported to be: documents seized from each of the designated locations. Schultz asserts that these exhibits should have been excluded because the government did not lay a proper evidentiary foundation for the admission of these documents pursuant to Federal Rule of Evidence 901 (Requirement of Authentication or Identification); thus, Schultz argues that the court's admission of these documents constituted plain error and warrants a new trial.

Although Schultz raises his concerns about the proper evidentiary foundation for these exhibits, he did not object to the admission of any of these documents at trial. Where a party fails to lodge an objection at trial regarding the admissibility of exhibits, any grounds of complaint as to admissibility are waived. *See Roach*, 28 F.3d at 732 (citing *United States v. Roenigk*, 810 F.2d 809, 815 (8th Cir.1987) and *United States v. Watts*, 950 F.2d 508, 513 (8th Cir.), *cert. denied*, 503 U.S. 911, 112 S.Ct. 1276, 117 L.Ed.2d 502 (1991)); *United States v. Wagoner*, 713 F.2d 1371, 1376 (8th Cir.1983) (failure to object to evidence is a "waiver of any grounds of complaint to its admissibility"); *United States v. Collins*, 690 F.2d 670, 674 (8th Cir.1982). Because Schultz failed to ob-

ject to the admissibility of the exhibits in question upon their admission at trial, the court can only review the matter for plain error. *Roach,* 28 F.3d at 732; *Ojeda,* 23 F.3d at 1477 (without a finding of plain error, failure to object precludes review); *United States v. Solomonson,* 908 F.2d 358, 361 (8th Cir.1990) (where counsel did not make contemporaneous objection at the time the exhibits were offered, court will review only for plain error); *United States v. McBride,* 862 F.2d 1316, 1319 (8th Cir.1988) ("Counsel cannot stand idly by, permit the presentation of erroneous matter at trial, and then complain about the inclusion of that evidence in the trial record, absent plain error."); *Wagoner,* 713 F.2d at 1376 (where defendant did not raise an objection at trial regarding the admissibility of evidence, court can only review whether admission amounted to plain error). To establish plain error, the defendant must show the court erred by deviating from a legal rule, the error is "plain" or clear under current law, and the error affected the defendant's substantial rights. *See United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); *United States v. Prendergast,* 4 F.3d 560, 561 (8th Cir.1993) (other citations omitted); *Solomonson,* 908 F.2d at 361 (relief will be granted under the plain error doctrine only if the error "prejudices the substantial rights of the defendant and would result in a miscarriage of justice if left uncorrected") (quoting *United States v. Carey,* 898 F.2d 642, 644 (8th Cir.1990)). In determining whether admission of the contested exhibits in this case was plain error, the court must consider the record as a whole and grant relief only to protect the "fundamental fairness of the proceeding." *Solomonson,* 908 F.2d at 361 (citing *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)).

▇ Here, Schultz claims the government did not lay a proper foundation for the admission of Series 3, 6, 7, 8, 9, 10, 13 exhibits in that no agent testified that those exhibits came from a certain location, only that the exhibits were "consistent with" those documents seized at the respective location. In questioning the existence of proper foundation for these particular exhibits, Schultz asserts that these exhibits have not been properly authenticated under the Federal Rules of Evidence. Federal Rule of Evidence 901(a) provides that the authentication requirement for evidence "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See MDU Resources Group v. W.R. Grace & Co.,* 14 F.3d 1274, 1282 n. 12 (8th Cir.) (citing *Fed.R.Evid.* 901(a)), *cert. denied,* —— U.S. ——, 115 S.Ct. 89, 130 L.Ed.2d 40 (1994). To satisfy this requirement, the government needs only to demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be. *MDU Resources Group,* 14 F.3d at 1282 (citing *United States v. Long,* 857 F.2d 436, 442 (8th Cir.1988), *cert. denied,* 502 U.S. 828, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991)); *United States v. Coohey,* 11 F.3d 97, 99 (8th Cir. 1993). Furthermore, authenticity can often be established by the contents or other distinctive characteristics of the challenged evidence when taken in conjunction with the circumstances. *United States v. McGlory,* 968 F.2d 309, 331 (3d Cir.) (exhibits that were originally notes found in trash contained distinctive characteristics linking them to defendant) (citing *United States v. Baker,* 855 F.2d 1353, 1359 (8th Cir.1988), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989)), *cert. denied,* 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992); *United States v. Baker,* 855 F.2d 1353, 1359 (8th Cir.1988) (where all of exhibits introduced into evidence contained distinctive characteristics linking the items to the defendant, no abuse of discretion in admitting exhibits) (citing *Fed.R.Evid.* 901(b)(4) and *United States v. Helmel,* 769 F.2d 1306, 1312 (8th Cir.1985)), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989); *United States v. Reyes,* 798 F.2d 380, 383 (10th Cir.1986) (contents of notes to members of conspiracy provided the basis for admissibility); *United States v. Eisenberg,* 807 F.2d 1446, 1452 (8th Cir.1986) (authenticity may be proven by circumstantial evidence); *United States v. Wilson,* 532 F.2d 641, 644–45 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976) (other evidence corroborated the authenticity

of notebooks). Also, the Eighth Circuit has held that physical evidence may be admitted if the court is "satisfied that in reasonable probability the evidence has not been changed." *See United States v. Pazzanese,* 982 F.2d 251, 252 (8th Cir.1992).

Here, no government witness testified that the exhibits marked and organized into independent series were the exhibits that came from the respective location claimed by the government. The government witnesses whom counsel called to lay the foundation for these exhibits only stated that the exhibits were "consistent with" those found at each location. Although the government did present several witnesses who testified about the collection and preservation of the voluminous amount of documents seized from the two locations controlled by Schultz, namely, 1100½ Central and 320½ Central in Fort Dodge, Iowa, not one witness or series of witnesses verified that the records were what the government claimed them to be—the same documents seized from the alleged location. *See MDU Resources Group,* 14 F.3d at 1282 n. 12. Regardless of how many witnesses the government presented, the government's continuous claims that the challenged documents "were consistent" with the appearance of those seized at each location did not suffice to satisfy the authentication requirements. Thus, the documents from Series/Box 3, 6, 7, 8, 9, 10, 13 would not have been admitted into evidence if a proper objection had been made.

■ Schultz's attorney, however, did not object to the admission of these exhibits into evidence. Thus, to find that the court's admission of these documents was plain error, the court must find that it committed an error which was "plain" or clear under current law, and the court must review the record as a whole to make this determination. *See Olano,* 507 U.S. at 732–35, 113 S.Ct. at 1777–78; *Prendergast,* 4 F.3d at 561; *Solomonson,* 908 F.2d at 361. Here, Bogle testified how the exhibits were seized from the location, boxed, and shipped to the laboratory. Other government witnesses testified about the seizure of the documents from 1100½ Central and 320½ Central. Although no witness identified the exhibits as the same

documents from these locations, the witnesses testified about the seizure of and the procedure in collecting and preserving these documents. Furthermore, neither party has cited one case in which a court has found plain error in the admission of exhibits for which a proper foundation was not laid. This court declines the opportunity to be the first court to reach such a conclusion. Thus, the court finds the admission of these exhibits, where foundation was lacking but defendant failed to object at trial, does not rise to the level of plain error. *See United States v. Nieto,* 60 F.3d 1464, 1468 (10th Cir.1995) ("to the extent a lack of foundation in some answers makes it unclear whether certain testimony was based on personal knowledge or hearsay, we conclude that admitting such evidence in the absence of an objection did not constitute plain error"), *cert. denied,* —— U.S. ——, 116 S.Ct. 793, 133 L.Ed.2d 742 (1996). Had the defendant objected to the admission of this evidence at trial, the court would have sustained the objection. However, the court also finds that it would have been relatively simple for the government to cure this foundational deficiency. Because the government could have likely remedied its error in laying a foundation for these exhibits, and because Schultz does not dispute that many of these exhibits are, in fact, his betting and wagering records and does not argue that these exhibits have been tampered with or altered in any way, the admission of these exhibits did not result in a "miscarriage of justice." *See Solomonson,* 908 F.2d at 361; *Carey,* 898 F.2d at 644. Therefore, the court finds it did not commit "plain error" in admitting these exhibits and denies Schultz's motion for new trial on this basis.

## IV. CONCLUSION

Based upon a review of the evidence presented at the close of the government's case, upon viewing the evidence in a light most favorable to the government, the court concludes that a reasonable jury could have found Schultz conducted an illegal gambling business in violation of 18 U.S.C. § 1955, a business that violated state law, that involved five or more persons, and that continued for

a period of more than thirty days or that had a gross revenue of $2,000.00 in one day.

Regarding the five-person requirement under § 1955, the government identified Clergy, Fall, and Sapp by their account designations in Schultz's records and as sources of line information for Schultz for more than thirty days or on one day in which the business had a gross revenue of $2,000.00. The court also finds that while there was not much evidence to support the theory that Schultz engaged in lay off betting, a reasonable jury could have concluded, based upon its determination of the credibility of Stirling and Pischke and its weighing of the evidence, that Schultz did, in fact, engage in lay off betting. The court also concludes that based particularly upon the documentary evidence submitted, the jury could have reasonably concluded that Schultz was exchanging line information with other members of the jurisdictional five for more than thirty days or on one day on which the business had a gross revenue of $2,000.00 or more, in violation of 18 U.S.C. § 1955.

In reference to the other members of the jurisdictional five, the court also finds that the government identified Hull as an individual who assisted Schultz in getting started in the gambling business and provided Schultz a place from which to operate the business. Furthermore, the court concludes the government proved by a preponderance of the evidence that Hull's statements were made during the course of and in furtherance of the conspiracy to conduct an illegal gambling business; thus, Hull's statements regarding the business were properly admitted. Thus, considering the government's evidence concerning Hull's role in the business and Hull's statements, the court concludes that a reasonable jury could have found that Hull was a participant in the jurisdictional five persons for more than thirty days or on one day on which the business had a gross revenue of $2,000.00 or more, in violation of § 1955. Lastly, the government identified Kramer as a source of line information and as a person who took phone calls for the business. Thus, viewing the evidence in the light most favorable to the government, a reasonable jury could have included Kramer as a member of the jurisdictional five persons during the re-

quired time period or on one day on which the business had a gross revenue of $2,000.00 or more, in violation of § 1955. Thus, for the reasons articulated above, the court will not overturn Schultz's conviction of Count One of the indictment and denies Schultz's motion for judgment of acquittal on this count.

In addition, the court finds that, viewing the evidence in a light most favorable to the government, a reasonable jury could have concluded that Schultz violated 18 U.S.C. § 371 in conducting or using a telephone to further a five-person gambling business in violation of 18 U.S.C. § 1955. Specifically, the court concludes that a reasonable jury could have found that Schultz agreed to violate 18 U.S.C. § 1955 by conducting an illegal gambling business, that Schultz voluntarily and intentionally joined in the agreement, that he knew the purpose of the gambling business at the time he joined the agreement, and that while the agreement to conduct this business was in effect, a party to the conspiracy knowingly committed an overt act listed in the indictment. Thus, the court will not overturn Schultz's conviction of Count Four of the indictment and denies Schultz's motion for judgment of acquittal on this count as well.

Upon consideration of Schultz's motions for new trial, the court finds the government proved by a preponderance of the evidence that Schultz and Hull were co-conspirators, and as such, the statements of Hull were admissible in the case against Schultz. Thus, despite the significantly harmful effect of the admission of these statements, the court finds the interests of justice do not require a new trial on this ground. In addition, the court finds the government failed to lay the proper foundation for the admission of a voluminous amount of exhibits, namely, Series/Box 3, 6, 7, 8, 9, 10, and 13. Defense counsel, however, did not object to the admission of these exhibits into evidence, and the court concludes that the court's admission of these exhibits did not constitute plain error and does not warrant a new trial.

**IT IS SO ORDERED.**